MATHESON, Circuit Judge.
*1187 TABLE OF CONTENTS
I. BACKGROUND....1189
A. Factual Background....1189
B. Procedural Background....1191
II. DISCUSSION....1192
A. Issue One: Constitutionality of 18 U.S.C. § 2423(c) under the Foreign Commerce Clause....1192
1. Section 2423(c) and Congress's Efforts to Combat Sex Trafficking....1193
a. Provisions of the statutory scheme....1193
b. Early efforts to combat sex trafficking....1194
c. Legislative history leading to passage of § 2423(c)....1195
i. Enactment of § 2423(b)....1195
ii. Enactment of § 2423(c)....1196
2. The Commerce Clause....1197
a. ICC case law....1197
i. Channels....1197
ii. Instrumentalities....1198
iii. Substantial effect....1198
b. FCC case law....1199
3. Congressional Authority Broader Under the FCC than the ICC....1200
a. History....1201
b. Text....1201
c. Purpose....1202
d. The dissent's view....1203
i. Japan Line and the scope of FCC power....1203
ii. Sovereignty of other nations....1204
iii. Summary....1206
4. The Lopez Categories in the Foreign Commerce Context....1206
a. The ICC's three categories as a starting point....1207
b. The substantial-effect category is applicable here....1207
c. Evolution of the third Lopez category....1207
d. Adapting the third Lopez category to the FCC....1209
5. Constitutionality of § 2423(c)....1210
a. Section 2423(c)'s legislative history supports rational basis....1210
b. Section 2423(c) is an essential part of a broader statutory scheme....1211
c. Section 2423(c)'s jurisdictional element supports rational basis....1212
d. Raich supports rational basis for § 2423(c)....1212
e. Rational basis standard....1215
6. Legal Landscape....1215
7. Conclusion....1216
B. Issue Two: Brady Claim....1217
1. Additional Procedural Background....1217
a. Trial testimony....1217
b. Supplemental motion for new trial....1218
2. Analysis....1220
a. Standard of Review....1220
b. Legal Background....1220
c. No prejudice for a....1221
C. Issue Three: Mr. Durham's Statements about Child Pornography and Homosexuality....1222
1. Standard of Review....1222
2. Additional Factual Background....1222
a. Evidence about child pornography and homosexuality....1222
b. District court rulings....1223
3. Legal Background....1224
a. Rule 404(b)....1224
b. Rules 401 and 402....1224 *1188 c. Rule 403....1224
4. Analysis....1224
a. Rule 404(b)....1224
b. Rules 401 and 402....1225
c. Rule 403....1225
D. Issue Four: Prosecutorial Misconduct....1225
1. Standard of Review....1226
2. Additional Factual Background....1226
a. The Government's cross-examination of Mr. Durham....1226
b. The Government's closing argument....1226
3. Additional Procedural Background....1227
4. Legal Background....1227
5. Analysis....1227
a. Preservation....1228
i. Alleged misconduct during cross-examination of Mr. Durham....1228
ii. Alleged misconduct during closing argument....1228
b. Plain error-substantial rights....1228
i. Alleged misconduct during cross-examination of Mr. Durham....1228
ii. Alleged misconduct during closing argument....1229
E. Issue Five: Cellphone Videos Authentication....1230
1. Standard of Review....1230
2. Additional Background....1230
a. Pre-Trial....1230
b. Trial....1231
3. Legal Background....1232
4. Analysis....1232
F. Issue Six: Victims' Medical Records....1233
1. Standard of Review....1233
2. Additional Background....1233
3. Legal Background....1234
a. Invited error....1234
b. Authentication....1234
c. The hearsay rule and pertinent exceptions....1234
d. Unfair prejudice....1234
4. Analysis....1235
G. Issue Seven: Substantive Reasonableness of Sentence....1236
1. Standard of Review....1236
2. Additional Factual Background....1236
3. Legal Background....1238
4. Analysis....1238
H. Issue Eight: Cumulative Error....1239
III. CONCLUSION....1240
Matthew Durham appeals his convictions and sentence on four counts for illicit sex with minors in Kenya after travelling there from the United States. This opinion addresses the following eight issues presented for appellate review.
1. Is 18 U.S.C. § 2423(c), the statute on which the convictions were based, unconstitutional on its face and as applied to Mr. Durham because it exceeds Congress's power under the Foreign Commerce Clause in Article 1, Section 8, Clause 3 of the Constitution? We hold that § 2423(c) is constitutional because Congress could rationally conclude that travel abroad followed by illicit sex with a minor, in the aggregate, substantially affects foreign commerce.
2. Did the district court err when it denied Mr. Durham's supplemental motion for a new trial alleging that the Government suppressed exculpatory evidence in violation of Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ? We affirm because Mr. Durham has not shown that nondisclosure of the evidence prejudiced his case.
*1189 3. Did the district court err under Federal Rules of Evidence 401, 403, and 404(b) when it allowed admission of Mr. Durham's statements about his struggles with child pornography and homosexuality? We affirm. The district court did not abuse its discretion in determining the evidence was intrinsic, relevant, and not unduly prejudicial.
4. Did the district court err when it denied Mr. Durham's motion for a new trial alleging that the Government made improper statements about his struggle with homosexuality during cross-examination of Mr. Durham and during closing argument? We affirm under plain error review because Mr. Durham cannot show that the prosecutor's statements affected his substantial rights.
5. Did the district court err in admitting cellphone video recordings because they were not properly authenticated? We affirm. The district court did not abuse its discretion because the Government presented sufficient foundation evidence for authentication.
6. Did the district court err when it admitted the victims' entire medical records? We affirm because Mr. Durham invited any error and because his arguments alleging lack of authentication, inadmissible hearsay, and unfair prejudice do not show that the district court erred in admitting the records.
7. Did the district court abuse its discretion and impose a substantively unreasonable sentence when it sentenced Mr. Durham to 480 months in prison? We affirm because Mr. Durham cannot overcome the presumption that the district court reasonably weighed the sentencing factors under 18 U.S.C. § 3553(a) or show that its sentencing decision exceeds the bounds of permissible choice.
8. Should the convictions be reversed because the errors, considered cumulatively, deprived him of a fair trial? Mr. Durham cannot show that any errors that may be eligible for cumulative error review cumulatively affected his substantial rights.
Exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we therefore affirm Mr. Durham's convictions and sentence.
I. BACKGROUND
A. Factual Background
On May 1, 2014, Mr. Durham, then 19 years old, arrived in Kenya on his fourth Christian missionary trip there. ROA, Vol. 12 at 1818 (TT 1204); ROA, Vol. 10a at 25.[1] In Kenya, he volunteered at the Upendo Children's Home ("Upendo"), where 33 children from impoverished backgrounds live. ROA, Vol. 12 at 695-97, 787 (TT 81-83, 173). Upendo Kids International, an Oklahoma non-profit founded and directed by Eunice Menja, operates Upendo. Id. at 787, 960 (TT 173, 346), Aplee. Br. at 3. Ms. Menja's sister, Josephine Wambugu,[2] is the manager of Upendo. ROA, Vol. 12 at 695, 788 (TT 81, 174).
On his previous trips to Kenya, Mr. Durham had stayed with a host family, but on the fourth trip, he asked to stay at *1190 Upendo instead. Id. at 1811 (TT 1197). On June 12, 2014, Ms. Wambugu entered one of the girls' bedrooms and saw Mr. Durham lying on a bed with one of the girls. Id. at 705, (TT 91). When Ms. Wambugu came into the room, Mr. Durham left quickly. Id. at 705-06 (TT 91-92). Ms. Wambugu then spoke to some of the girls, who said they had "been doing bad manners" with Mr. Durham. ROA, Vol. 12 at 710-11 (TT 96-97). The children used "bad manners" to mean engaging in sexual acts. See id. at 662 (TT 48); 1412 (TT 798); 1443-44 (TT 829-30).
On June 13, Ms. Menja, Ms. Wambugu, Jason Jeffries (another American volunteer at the home), and Tom Mutonga (a local supporter of Upendo) met with Mr. Durham at Upendo. Id. at 817, 825 (TT 203, 211). When he entered the meeting, Mr. Durham yelled, "You can fire me, fire me now." Id. at 825 (TT 211). Ms. Menja accused him of hurting the girls and asked for his response. Id. at 826 (TT 212). Mr. Durham said he did not remember, and asked to speak to Ms. Wambugu alone. Id. at 826-27 (TT 212-13).
Once alone, he asked Ms. Wambugu to defend him, and she asked him whether he had done the acts reported by the girls. Id. at 723 (TT 109). He said, "Yes, I did it. Yes, I did." Id. at 723 (TT 109). But when he went back to talk to the group, Mr. Durham again said he could not remember assaulting the children. He added that he had been struggling with child pornography and homosexuality. Id. at 724, 828 (TT 110, 214). Ms. Menja told Mr. Durham she was going to take him to a different location, explaining that, for the safety of the children, she did not want him to stay at the children's home. Id. at 829 (TT 215). He spent the next three days at an empty house owned by Ms. Menja's father-in-law. Id. at 830 (TT 216). One of the volunteers had taken Mr. Durham's passport after hearing about the allegations. Id. at 1052 (TT 438).
During his time away from Upendo, Mr. Durham sent his father text messages stating: "I don't want to live anymore" and "I hate myself. I deserve to burn in hell." ROA, Vol. 9 at 78 (Gov't Exh. 29). He sent a text to Ms. Menja saying: "Tell all the kids how sorry i am, and i am praying for their forgiveness every hour." Id. at 18 (Gov't Exh. 10) (errors in original).
Mr. Durham's great-uncle arranged for Mr. Durham to fly back to Oklahoma. ROA, Vol. 12 at 1682-83 (TT 1068-69). On June 17, before he flew out, Mr. Durham met with Ms. Menja, Ms. Wambugu, and Mr. Mutonga at the Seagull restaurant. Id. at 855 (TT 241). Ms. Menja video recorded some of the ensuing conversation in multiple videos on her cellphone (the "Seagull Confession Videos"). Id. at 856 (TT 242). Mr. Durham knew that he was being recorded and asked that the video be kept on. Gov't Exh. 4 at 12:09. On the longest video, Ms. Menja asked Mr. Durham about the allegations. He responded that he had struggled with a "temptation to touch children and to be with other men." Gov't Exh. 4 at 1:55-2:01. When Ms. Menja started asking about specific children who had accused him of abuse, Mr. Durham admitted to assaulting those children. See, e.g. , id. at 5:39-6:15.
After Ms. Menja stopped recording the video, she said she could not listen any more, and Mr. Durham offered to write down his confession. ROA, Vol. 12 at 865 (TT 251). He wrote detailed statements about how he abused or otherwise engaged in inappropriate behavior with over ten of the children. ROA, Vol. 9 at 8-16. The following relate to three of the four charges of conviction and each concerns a different victim:
• "I would take her to the bathroom at night and hold her down and rape her. This happened on several occasions.
*1191 I also made her watch me do things to [another girl]. I told her never to tell anyone, and that I loved her." ROA, Vol. 9 at 8 (Gov't Exh. 9).
• "I would take her to the bathroom and have her take off her clothes. I would touch myself and her. I don't know how many times it occurred. Also, when we had our sleepovers Friday night, [she] always made a point to sleep by me. I would spoon with her until I woke up." Id. at 15 (Gov't Exh. 9).
• "I took her to the bathroom and force[d] her to have sex with me. This happened on more than one occasion. I made her swear to never tell anyone.... Any time I try to read the bible or pray, this image comes to my [head]." Id. at 16 (Gov't Exh. 9).
Ms. Wambugu next spoke to the Kenyan police, who told her they could not arrest Mr. Durham. ROA, Vol. 12 at 873-74 (TT 259-60). Ms. Menja returned Mr. Durham's passport to him, and he flew out of Kenya the night of June 17. Id. at 874-75 (TT 260-61).
Ms. Menja took six victims to a doctor the next day, June 18. Id. at 875 (TT 261). Medical workers examined them and determined five out of six had perforated hymens. Id. at 1187-88 (TT 574-75). Ms. Menja later reported what had happened to the U.S. Embassy. Id. at 875 (TT 261).
B. Procedural Background
Mr. Durham was arrested in the United States on July 18, 2014. ROA, Vol. 1 at 77. A grand jury returned an original indictment on August 5, 2014, charging three counts. Id. at 130-31. It later returned two superseding indictments. Id. at 248, 467. The second, the operative indictment, was returned in April 2015 and charged Mr. Durham with eight counts of interstate travel with intent to engage in a sexual act with a child, in violation of 18 U.S.C. § 2241(c), and eight counts of traveling in foreign commerce and engaging in illicit sexual conduct with a minor, in violation of 18 U.S.C. § 2423(c). Id. at 467-76. The indictment identified eight victims by their initials. Id. Mr. Durham also was charged with one count of traveling in foreign commerce with intent to engage in illicit sexual conduct in violation of 18 U.S.C. § 2423(b).
Trial was held between June 10, 2015, and June 18, 2015. Five of the eight alleged victims testified, including the victims associated with each of the four convictions. ROA, Vol. 12 at 658, 1406, 1426, 1440, 1458. Dr. Alawiya Abdulkadir Mohamed, who prepared some of the medical documentation in Kenya, also testified for the prosecution. Id. at 1186-88 (TT 572-74). Mr. Durham's written and videotaped confessions and his text messages were admitted into evidence. Id. at 737, 857, 1248 (TT 123, 243, 634).
Mr. Durham testified in his defense. ROA, Vol. 12 at 1792 (TT 1178). The defense also presented testimony from a professional counselor about forensic interviews with victims of sexual assault, id. 1506, 1515 (TT 892, 901), and from a sexual assault nurse examiner, Lisa Dunson, about the medical findings in the case, id. at 1581 (TT 967). Mr. Durham's mother, father, and great-uncle also testified in his defense. Id. at 1638, 1721, 1759 (TT 1024, 1107, 1145).
The jury found Mr. Durham guilty on seven counts of traveling in foreign commerce and engaging in illicit sexual conduct with a minor in violation of 18 U.S.C. § 2423(c). ROA, Vol. 3 at 193-94. It found him not guilty of the remaining counts. Id. Mr. Durham moved for arrest of judgment, arguing that 18 U.S.C. § 2423(c) is unconstitutional. Id. at 229. He also moved for acquittal and a new trial. Id. at 277, 305. Mr. Durham supplemented his motion for a new trial when he learned the prosecution *1192 had failed to disclose information favorable to the accused during trial. Id. at 489.
The district court denied the motions for arrest of judgment and a new trial. Id. at 752, 760, 776, 811. It granted acquittal on three of the § 2423(c) counts because the Government had not shown Mr. Durham engaged in "sexual conduct" as defined by the statute, but it denied acquittal on the other four counts. Id. at 762-67, 774-75.
The final Presentence Investigation Report ("PSR") calculated a recommended sentence of 1,440 months in prison under the United States Sentencing Guidelines (the "Guidelines"), based on Mr. Durham's total offense level and criminal history category. ROA, Vol. 7 at 142. This represented the statutory maximum of 30 years for each count of conviction, running consecutively. Id. at 142 n.3. The district court sentenced Mr. Durham to 480 months in prison, a sentence it characterized as a variance below the Guidelines range. ROA, Vol. 3 at 844; ROA, Vol. 7 at 477; ROA, Vol. 13 at 158.
II. DISCUSSION
Mr. Durham raises eight issues on appeal. As to each issue, we present the applicable standard of review and also provide additional factual, procedural, and legal background, as needed.
A. Issue One: Constitutionality of 18 U.S.C. § 2423(c) under the Foreign Commerce Clause
Mr. Durham challenges the constitutionality of 18 U.S.C. § 2423(c), arguing that Congress exceeded its authority under the Foreign Commerce Clause. See U.S. Const. art. I, § 8, cl. 3. Section 2423(c) makes it a crime for "[a]ny United States citizen or alien admitted for permanent residence [to] travel[ ] in foreign commerce ... and engage[ ] in any illicit sexual conduct with another person." 18 U.S.C. § 2423(c). "Illicit sexual conduct" includes any commercial or noncommercial sexual act with a person under the age of 18, id . § 2423(f)(1)-(2), and the production of child pornography, id . § 2423(f)(3). Mr. Durham was charged under § 2423(c) for traveling abroad and engaging in noncommercial sexual acts with minors. He argues that, because noncommercial illicit sexual activity abroad has no relation to foreign commerce, the statute is unconstitutional on its face and as applied to him and his conviction therefore cannot stand.[3] We review his *1193 challenge de novo. United States v. Pompey , 264 F.3d 1176, 1179 (10th Cir. 2001) ("We review challenges to the constitutionality of a statute de novo." (quotations omitted) ); see also People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv. (PETPO ), 852 F.3d 990, 1000 (10th Cir. 2017), cert. denied , --- U.S. ----, 138 S.Ct. 649, 199 L.Ed.2d 586 (2018).
We reject Mr. Durham's constitutional challenge to § 2423(c). Congress adopted this provision and several others in 2003 as part of a broad regulatory effort that started in 1907 to combat international sex trafficking. As the following discussion shows, Congress could reasonably conclude that United States citizens and permanent residents who, in the aggregate, travel to foreign countries and commit illicit sex acts there substantially affect foreign commerce. As a result, we must defer to congressional judgment and uphold § 2423(c).
1. Section 2423(c) and Congress's Efforts to Combat Sex Trafficking
Section 2423(c) makes it a crime for "[a]ny United States citizen or alien admitted for permanent residence [to] travel[ ] in foreign commerce ... and engage[ ] in any illicit sexual conduct with another person." 18 U.S.C. § 2423(c). It is situated within a broad anti-sex trafficking statutory scheme that Congress constructed through a century of legislation. Congress attempted to address sex trafficking in the early 1900's by prohibiting the importation of women and girls for sexual exploitation. Expanding on these efforts, it enacted legislation for the prosecution of individuals who traveled abroad intending to engage in sex tourism. But proving intent was difficult. In response, Congress passed § 2423(c), which targets individuals who travel abroad and engage in illicit sexual conduct regardless of intent. When reviewed in historical context and the overall legislative scheme, Congress reasonably viewed § 2423(c) as playing an important role in its broader efforts to combat international sex tourism.
The following discussion describes how § 2423(c) facilitates Congress's efforts to combat international sex tourism. We provide a brief overview of Chapter 117 in Title 18 of the United States Code, which contains 18 U.S.C § 2423 and other anti-trafficking provisions; chart the historical development of § 2423 ; and review the legislative history leading to the enactment of § 2423(c).
a. Provisions of the statutory scheme
Chapter 117 criminalizes various activities related to sex trafficking. See 18 U.S.C. §§ 2421 - 2428 (titled "Transportation for Illegal Sexual Activity and Related Crimes"). It generally prohibits the knowing transport of "any individual in interstate or foreign commerce ... with [the] intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense." Id . § 2421 (titled "Transportation generally"). It also targets other activities that facilitate sex trafficking. See, e.g. , id. § 2422 (coercion or enticement of individuals to engage in prostitution or illicit sexual activity); id . § 2424 (harboring individuals for purpose of prostitution); id . § 2425 (transmission of information to entice individuals into illicit sexual activity).[4]
*1194 Title 18 U.S.C. § 2423, which falls within Chapter 117, deals specifically with the trafficking and sexual exploitation of minors. See id . § 2423 (titled "Transportation of minors"). Its seven provisions criminalize activities that involve illicit sexual contact with minors. See id . § 2423(a) - (g) ; see, e.g. , id . § 2423(a) (the transportation of minors for prostitution or illicit sexual activity). Three of its provisions- § 2423(b), § 2423(c), and § 2423(d) -address international sex tourism. Section 2423(b) makes it a crime to travel with the intent to engage in illicit sex. See id . § 2423(b). Section 2423(c) targets individuals who travel abroad and engage in illicit sex-regardless of intent. See id . § 2423(c). Section 2423(d) targets businesses that "arrange[ ], induce[ ], procure[ ] or facilitate[ ] the travel of a person" intending to engage in illicit sexual conduct abroad for financial gain. Id . § 2423(d). "Illicit sexual conduct" includes commercial and noncommercial sex acts[5] with a "person under 18 years of age." Id. § 2423(f)(1)-(2).[6]
b. Early efforts to combat sex trafficking
Section 2423 developed through a century of legislation addressing international sex trafficking. In the early 1900's, Congress was concerned about the growing sex trafficking industry from Europe in particular. In 1907, it prohibited the "importation" of women or girls into the United States "for the purpose of prostitution, or for any other immoral purpose." Act of Feb. 20, 1907, Pub. L. No. 59-96, § 3, 34 Stat. 898, 899 ("1907 Act") (regulating "the immigration of aliens into the United States").[7] Congress recognized this practice as a "present-day existing evil of widespread dimensions" that must be stopped. S. Rep. No. 61-702, at 14 (1910).
Two years later, congressional investigators released a report concluding that the 1907 Act had failed to stem sex trafficking into the United States. See Importing Women for Immoral Purposes , S. Doc. No. 61-196, at 33-36 (1909) (recommending a number of policy changes addressing the unsolved problem of sex trafficking); H.R. Rep. No. 61-47, at 12 (1909). The 1907 Act had focused on stopping the flow of trafficked women at the border, but it failed to address the problem of women passing through immigration channels undetected. See S. Doc. No. 61-196, at 33-34; see also Ariela R. Dubler, Immoral Purposes: Marriage and the Genus of Illicit Sex , 115 Yale L.J. 756, 787 (2006). The report recommended criminalizing the interstate transportation of women and girls for the purpose of prostitution. S. Doc. No. 61-196, at 36; see also H.R. Rep. No. 61-47, at 10 (explaining this change was necessary to prevent the "evil" of importing women from foreign nations; otherwise prostitution "can not [sic] be met comprehensively and effectively").
*1195 In response, Congress passed the Mann Act of 1910, attempting to "put a stop to a villainous interstate and international traffic in women and girls." H.R. Rep. No. 61-47, at 9; see White-Slave Traffic (Mann) Act, Pub. L. No. 61-277, §§ 2-8, 36 Stat. 825, 825-27 (1910) (codified at 18 U.S.C. §§ 397-404 (1940) ). Section 2 of the Mann Act prohibited the transportation of women or girls across state or international lines for the purpose of illicit sexual acts. See § 2, 36 Stat. at 825. It is the precursor of the current § 2423.[8]
In 1978 and 1986, Congress broadened the provisions of the Mann Act to fight sex trafficking. In 1978, Congress expanded the law preventing the commercial sexual exploitation of girls to include all children. See The Protection of Children Against Sexual Exploitation Act of 1977, Pub. L. No. 95-225, § 3, 92 Stat. 7, 8 (1978) (codified at 18 U.S.C. § 2423(a)(1)-(2) (1982) ); see also H.R. Rep. No. 99-910, at 4 (1986). But, as Congress acknowledged less than a decade later, the 1978 Act failed to address noncommercial exploitation-such as transporting children for the purpose of producing child pornography for private rather than commercial use. See H.R. Rep. No. 99-910, at 7. In response, Congress passed amendments in 1986 to encompass noncommercial sexual exploitation. Child Sexual Abuse and Pornography Act of 1986, Pub. L. No. 99-628, § 5, 100 Stat. 3510, 3511 (1986) (codified at 18 U.S.C. § 2423 (1988) ).
c. Legislative history leading to passage of § 2423(c)
The next two major revisions to § 2423 occurred in 1994 and 2003. Congress added § 2423(b) and § 2423(c) to target sex tourism.
i. Enactment of § 2423(b)
In 1994, Congress enacted § 2423(b) as part of the Violent Crime Control and Law Enforcement Act of 1994 ("Violent Crime Act"), making it a crime for "a United States citizen ... [to] travel[ ] in foreign commerce ... for the purpose of engaging in any sexual act ... with a person under 18 years of age...." Pub. L. No. 103-322, § 160001(g), 108 Stat. 1796, 2037 (1994) (codified at 18 U.S.C. §§ 2423(a) - (b) (1994) ). Its passage marked the first time Congress addressed sex tourism as part of its larger effort against international sex trafficking.
Section 2423(b) originated from Senator Charles Grassley's amendment to the Violent Crime Act. In a floor statement, Senator Grassley explained that its purpose was to combat child prostitution in the multibillion dollar child pornography and international sex tourism industries. See 139 Cong. Rec. 30,391 (1993). He recognized the problem of "Americans ... travel[ing] overseas to places where children are readily available for purchase and abuse." Id. This practice, he noted, allowed for "profit from the rape of children." Id. at 30,391-92. Representative Jim Ramstad, *1196 who proposed a similar amendment in the House, see The Child Sexual Abuse Prevention Act of 1994, H.R. 3993, 103rd Cong. (1994), explained in his floor statement that his amendment was intended to "strike a blow at 'pedophile sex tourism,' by making it a crime to travel overseas for the purpose of sexually abusing children." 140 Cong. Rec. 6,073 (1994).
ii. Enactment of § 2423(c)
Section 2423(b)'s reach was limited to individuals who traveled abroad intending to engage in illicit sex acts. But proving intent was difficult. See H.R. Rep. No. 107-525, at 2 (2002). In 2003, Congress enacted § 2423(c) to permit the prosecution of individuals who travel abroad and engage in illicit sex acts-regardless of whether they intended to do so at the time of travel.
Section 2423(c) was passed as part of the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act"), which targeted various aspects of the sex tourism industry. See Pub. L. No. 108-21, § 105, 117 Stat. 650, 654 (2003) (codified at 18 U.S.C. §§ 2423(b) - (g) (2006) ). Section 2423(c) adopted language from a previous bill-the Sex Tourism Prohibition Improvement Act of 2002 ("STPIA")-which had failed to pass, but its history helps in understanding § 2423(c). See Child Abduction Prevention Act and the Child Obscenity and Pornography Prevention Act of 2003: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Sec. of the H. Comm. on the Judiciary , 108th Cong. 25 (2003) ("Hearings ").[9] A House Judiciary Committee Report on STPIA noted that a large number of developing countries had "fallen prey to the serious problem of international sex tourism." H.R. Rep. No. 107-525, at 2. It acknowledged that § 2423(b)'s intent requirement limited the law's effectiveness. Id. at 3, 13. Eliminating the intent requirement, it found, would "close significant loopholes in the law [regarding] persons who travel to foreign countries seeking sex with children." Id. at 3.[10]
STPIA's language was incorporated into the PROTECT Act and ultimately became law in § 2423(c). The sponsor of § 2423(c), Representative Jim Sensenbrenner, who authored § 2423(c) in both the PROTECT Act and STPIA, explained that sex tourism supported one of the "fastest growing areas of international criminal activity"-human trafficking. 149 Cong. Rec. 7,625 (2003). The PROTECT Act's purpose was to curb that industry by punishing "persons who travel to foreign countries to engage in illegal sexual relations with minors." Id . at 7,633. But unlike § 2423(b), it would do so by criminalizing this conduct, "regardless of what [the perpetrator's] intentions may have been when he left the United States." Hearings at 25 (statement of Daniel P. Collins, Associate Deputy Att'y Gen., U.S. Dep't of Justice). Congress thus passed § 2423(c) to fill the enforcement gap created by § 2423(b)'s intent requirement.
* * * *
*1197 In sum, Congress has worked to combat sex trafficking-particularly of minors-for over a century, developing a statutory scheme targeting sexual exploitation for both commercial and noncommercial purposes. Part of this effort included passage of § 2423(b), which made it a crime to travel abroad intending to have illicit sex. Because the intent requirement limited the statute's effectiveness, Congress passed § 2423(c) to allow for prosecution regardless of intent. Congress viewed this provision as a critical part of its broader efforts to combat the multibillion dollar international sex trafficking market.[11]
2. The Commerce Clause
The Commerce Clause delegates power to Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The following discussion summarizes the Supreme Court's case law on the Interstate Commerce Clause ("ICC") and Foreign Commerce Clause ("FCC"). Although there is "rich case law interpreting the [ICC], the Supreme Court has yet to examine the [FCC] in similar depth." United States v. Bollinger , 798 F.3d 201, 209 (4th Cir. 2015), cert. denied , --- U.S. ----, 136 S.Ct. 2448, 195 L.Ed.2d 263 (2016) ; see also United States v. Clark , 435 F.3d 1100, 1102 (9th Cir. 2006) (noting the FCC's "scope has yet to be subjected to judicial scrutiny").
a. ICC case law
The Supreme Court has recognized that the ICC empowers Congress to regulate (1) the channels of interstate commerce, (2) the instrumentalities of interstate commerce, and (3) activities that substantially affect interstate commerce. United States v. Lopez , 514 U.S. 549, 558-59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) ; Perez v. United States , 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).
In Lopez , the Court considered whether Congress exceeded its authority under the ICC when it prohibited guns near schools in the Gun-Free School Zones Act. See Lopez , 514 U.S. at 551, 115 S.Ct. 1624. The Court explained that Congress's power to regulate commerce among the states is broad, but federalism concerns limit it. Congressional power "may not be extended so as to ... obliterate the distinction between what is national and what is local." Id. at 557, 115 S.Ct. 1624 (quotations omitted). "[The ICC's scope] must be considered in the light of our dual system of government." Id. (quotations omitted). The Court laid out the three categories of regulation, demarcating the ICC's outer limits. See id. at 557-59, 115 S.Ct. 1624.
i. Channels
Congress may regulate the channels of interstate commerce. United States v. Patton , 451 F.3d 615, 620 (10th Cir. 2006). It may prohibit the transportation of goods and people in interstate channels, *1198 effectively halting their interstate movements. See, e.g. , Caminetti v. United States , 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917) (upholding statute prohibiting the interstate transportation of women for "immoral" purposes); Champion v. Ames , 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903) (upholding statute prohibiting the transportation of lottery tickets across interstate lines). Congress need not be motivated by commercial concerns; it may also stop the movement of goods and people to prevent immoral or injurious activities. See, e.g. , United States v. Darby , 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (upholding a ban on the "injurious" transportation of goods produced in substandard labor conditions).
ii. Instrumentalities
Congress may regulate the instrumentalities of interstate commerce, or the "means of interstate commerce, such as ships and railroads." Patton , 451 F.3d at 621 (citing Lopez , 514 U.S. at 558, 115 S.Ct. 1624 ; Perez , 402 U.S. at 150, 91 S.Ct. 1357 ). Regulation "may extend to intrastate activities that threaten these instrumentalities," such as criminalizing the destruction of a grounded aircraft. Id . at 622.
Congress also may regulate "the persons or things that the instrumentalities are moving," such as criminalizing the theft of goods from an interstate carrier, like a train. Id . But "not all people and things that have ever moved across state lines" qualify as permissible targets of regulation. Id. The regulation of goods and people extends only to the duration of their transport. See id. Thus, under this category, Congress may regulate goods or people while they are on a ship or plane, but not necessarily once they are unloaded or disembark.
iii. Substantial effect
Finally, Congress may regulate activity-including intrastate activity-that "substantially affects" interstate commerce. Lopez , 514 U.S. at 559, 115 S.Ct. 1624. The Court has upheld, for example, federal regulation of intrastate coal mining, see Hodel v. Va. Surface Min. & Reclamation Ass'n , 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) ; intrastate public accommodation practices, see Katzenbach v. McClung , 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) ; and homegrown wheat production, see Wickard v. Filburn , 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). In each instance, the Court determined the laws under review regulated activity that had a substantial effect on interstate commerce. In making such a determination, courts need decide only whether Congress had a "rational basis" that such activities substantially affect interstate commerce. Gonzales v. Raich , 545 U.S. 1, 22, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (quotations omitted).
In deciding whether federal legislation is constitutional under the ICC, courts consider congressional findings or the legislative record regarding the effect of a regulated activity. See id . at 21, 125 S.Ct. 2195. Legislative findings, however, are neither necessary nor determinative in a court's rational-basis decision. See United States v. Morrison , 529 U.S. 598, 612, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (congressional findings are helpful, but not required nor sufficient for upholding a statute); Raich , 545 U.S. at 21, 125 S.Ct. 2195 (particularized findings not necessary).
In assessing a regulated activity's effect on interstate commerce, courts need not examine the activity in isolation, but may aggregate it. For example, courts may consider the effect of not just one farmer's wheat production on the national grain market, but may consider the cumulative *1199 effect of all farmers' production. See Wickard , 317 U.S. at 127-28, 63 S.Ct. 82. But courts should do so when the activity is economic as opposed to noneconomic. See Morrison , 529 U.S. at 613, 120 S.Ct. 1740 (holding that the effect of domestic violence, a noneconomic activity, could not be considered in the aggregate).[12] The economic-noneconomic distinction arises from federalism concerns and serves to preserve "what is truly national and what is truly local." Lopez , 514 U.S. at 567-68, 115 S.Ct. 1624. Courts would otherwise "pile inference upon inference" to determine a regulated activity substantially affects commerce. Id . at 567, 115 S.Ct. 1624.
Finally, courts also consider whether the statute contains an express jurisdictional element relating to interstate commerce. Id . at 561, 115 S.Ct. 1624. Congress may explicitly "require an additional nexus to interstate commerce" in its statute. Id. at 562, 115 S.Ct. 1624. For example, a statute that criminalizes the possession of a firearm that has traveled in interstate commerce contains an express jurisdictional element because violation of the statute hinges on the firearm's connection to interstate commerce. Id. (using what was formerly 18 U.S.C. § 1202(a) as an example).
b. FCC case law
Under the FCC, Congress may regulate commerce "with foreign Nations." U.S. Const. art. I, § 8, cl. 3. There is "precious little case law" on the FCC. United States v. Pendleton , 658 F.3d 299, 307 (3d Cir. 2011) ; see Clark , 435 F.3d at 1102 (noting "[c]ases involving the reach of the [FCC] ... are few and far between"). Two Supreme Court cases, however, provide some guidance.
First, in Board of Trustees of University of Illinois v. United States , 289 U.S. 48, 53 S.Ct. 509, 77 L.Ed. 1025 (1933), the Court upheld a federal tariff under the FCC. The University of Illinois argued that the tariff interfered with its importation of goods and was thus unconstitutional. Id. at 56, 53 S.Ct. 509. The Court disagreed, holding that Congress had acted within its "constitutional authority to regulate Commerce with foreign nations," id. (quotations omitted), which includes imposing duties on imports, "pass[ing] embargo and non-intercourse laws," and making "all other regulations necessary to navigation, to the safety of passengers, and the protection of property," id. at 58, 53 S.Ct. 509 (quotations omitted). This power "comprehend[s] every species of commercial intercourse between the United States and foreign nations," id. at 56, 53 S.Ct. 509 (quoting Gibbons v. Ogden , 22 U.S. (9 Wheat. 1) 193, 6 L.Ed. 23 (1824) ), and is "exclusive and plenary," id.
The Court further explained that the federalism constraints limiting Congress's ICC power do not apply in the FCC context. "The principle of duality in our system of government does not touch the authority of Congress in the regulation of foreign commerce." Id. at 57, 53 S.Ct. 509. The university had argued that the Constitution prohibited the taxation of state entities, in particular that federal taxation "is subject to the constitutional limitation that the Congress may not tax so as to impose a direct burden upon an instrumentality of a state used in the performance of a governmental function." Id . at 57-58, 53 S.Ct. 509. The tariff, however, was not a tax passed under the Congress's taxing power, but was instead a regulation passed under its FCC power. Because "the immunity of state instrumentalities ... [was] implied from the necessity of maintaining our dual *1200 system," this constitutional limitation did not extend to statutes regulating foreign commerce. Id. at 59, 53 S.Ct. 509. Rather, as in international relations, the "United States act[s] through a single government with unified and adequate power" in the foreign commerce arena. Id.
Second, in Japan Line, Ltd. v. County of Los Angeles , 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), the Court struck down California's property tax on shipping containers as a violation of the dormant FCC.[13] Japan Line, a Japanese shipping company, owed more than $550,000 in taxes on its shipping containers under California law. Id. at 437, 99 S.Ct. 1813. The company challenged the state tax's constitutionality. Id. at 440-41, 99 S.Ct. 1813. It argued that because the containers traveled only in foreign commerce, they were foreign instrumentalities-as opposed to interstate instrumentalities-and the dormant FCC protected foreign commerce from state interference such as the California tax. See id. at 437-38, 99 S.Ct. 1813. The Court agreed with Japan Line and concluded the state tax "may impair federal uniformity in an area where federal uniformity is essential." Id. at 448, 99 S.Ct. 1813. Normally, if a state tax is "applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, [and] does not discriminate against interstate commerce, ... no impermissible burden on interstate commerce will be found." Id. at 444-45, 99 S.Ct. 1813 (quotations omitted). State taxes on foreign entities are different, however, because there is a "need for uniformity in treating with other nations." Id. at 448, 99 S.Ct. 1813. States imposing their own taxes might create "asymmetry in the international tax structure," and foreign governments may retaliate in their trade policies with the United States. Id. at 450, 99 S.Ct. 1813. Compared with the ICC, "the Founders intended the scope of the foreign commerce power to be the greater," id. at 448, 99 S.Ct. 1813, and thus states are more likely to offend the FCC-rather than the ICC-with their taxation policy, see id. at 448-49, 99 S.Ct. 1813. California's tax was therefore unconstitutional under the dormant FCC. Id. at 453-54, 99 S.Ct. 1813.
3. Congressional Authority Broader Under the FCC than the ICC
"[The] scope [of the FCC] has yet to be subjected to judicial scrutiny." Clark , 435 F.3d at 1102. This section compares the boundaries of congressional authority under the FCC and the ICC. It describes how the FCC, unconstrained by federalism considerations, provides Congress broader authority to regulate commerce than the ICC.
Congressional authority under the FCC is broad because Congress must speak with "one voice" in the foreign commerce context. Japan Line , 441 U.S. at 449, 99 S.Ct. 1813 (quotations omitted). Moreover, as the dissent appears to agree, federalism limits congressional authority under the ICC, but not the FCC. See Dissent Op. at 1253. And, as the Supreme Court has stated, "[a]lthough the Constitution, Art. I, § 8, cl. 3, grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater." Japan Line , 441 U.S. at 448, 99 S.Ct. 1813 ; see also *1201 Atl. Cleaners & Dyers v. United States , 286 U.S. 427, 434, 52 S.Ct. 607, 76 L.Ed. 1204 (1932) ("[Congressional] power when exercised in respect of foreign commerce may be broader than when exercised as to interstate commerce.").
Because the FCC concerns commerce "with foreign Nations"-as opposed to commerce "among the several States"- the federalism considerations that constrain Congress's authority under the ICC do not apply to the FCC, which therefore confers broader authority on Congress. Bd. of Trustees , 289 U.S. at 57, 53 S.Ct. 509 ("The principle of duality in our system of government does not touch the authority of Congress in the regulation of foreign commerce."). History, text, and purpose support this conclusion.
a. History
For the Founders, expansive congressional control over foreign commerce was imperative. They wanted the federal government to have enough authority to promote foreign commerce, which comprised most of the early American economy. See Scott Sullivan, The Future of the Foreign Commerce Clause , 83 Fordham L. Rev. 1955, 1962-65 (2015). An 1877 report from the Treasury Department noted that at the time of the founding, "our foreign commerce ... attracted public attention much more than did the comparatively small internal commerce." Joseph Nimmo, Jr., Department of Treasury, Report on the Internal Commerce of the United States 8 (1877). Under the Articles of Confederation, state interference had disrupted foreign commerce, and federal power to tax and to regulate commerce was completely absent. See Sullivan at 1962-64. States circumvented federal trade agreements with foreign nations by negotiating their own. Id.
Because foreign commerce was so vital to the American economy, the Founders sought to bolster federal power over international trade and ensure that the federal government could "speak with one voice when regulating commercial relations with foreign governments." Japan Line , 441 U.S. at 449, 99 S.Ct. 1813 (quotations omitted). The FCC was designed as the "great and essential power" that the ICC merely "supplement[s]." The Federalist No. 42, at 283 (James Madison) (J. Cooke ed. 1961); see also United States v. Baston , 818 F.3d 651, 668 (11th Cir. 2016), cert. denied , --- U.S. ----, 137 S.Ct. 850, 197 L.Ed.2d 478 (2017).
b. Text
The FCC's text reflects the Founders' objective to provide broader authority than under the ICC. Again, the Commerce Clause delegates power to Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3 (emphases added). The difference between "with" and "among" affects the scope of the FCC and the ICC. See Sullivan at 1966-67 (describing how the difference allows states to retain some lawmaking authority under the ICC, but Congress retains full authority under the FCC and Indian Commerce Clause).
In Gibbons v. Ogden , the Supreme Court discussed the word "among" when it acknowledged that Congress may regulate intrastate activity under the ICC. 22 U.S. (9 Wheat. 1) 194, 6 L.Ed. 23 (1824). It said "[t]he word 'among' means intermingled with," and "[c]ommerce among the States[ ] cannot stop at the external boundary line of each State, but may be introduced into the interior." Id . But the Court also recognized limits to ICC authority. "Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one." Id. The word "among" restricts Congress from regulating "those [internal concerns] which are *1202 completely within a particular State." Id. at 195; see also Lopez , 514 U.S. at 553, 115 S.Ct. 1624 ("The Gibbons Court ... acknowledged that limitations on the commerce power are inherent in the very language of the Commerce Clause.").
After its discussion of commerce "among the several States," the Gibbons Court contrasted commerce "with foreign nations." Gibbons , 22 U.S. at 195. "[I]n regulating commerce with foreign nations, the power of Congress does not stop at the jurisdictional lines of several States." Id. Though the Court did not elaborate on the word "with," it pointed to the textual difference in the two clauses. "Among" in the ICC restrains Congress in regulating intrastate matters-a restraint not present in the FCC.
Both the FCC and the Indian Commerce Clause contain the preposition "with," and the Court has drawn comparisons between the two. The Indian Commerce Clause provides broad "plenary power" to Congress in regulating commerce with Indian tribes. United States v. Lara , 541 U.S. 193, 200, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004) (quotations omitted). The Court has recognized a similar breadth of authority under the FCC. "The power to regulate foreign commerce is certainly as efficacious as that to regulate commerce with the Indian tribes." Buttfield v. Stranahan , 192 U.S. 470, 493, 24 S.Ct. 349, 48 L.Ed. 525 (1904) ; see also United States v. Forty-Three Gallons of Whiskey , 93 U.S. 188, 194, 23 L.Ed. 846 (1876) ("Congress now has the exclusive and absolute power to regulate commerce with the Indian tribes[ ]-a power as broad and as free from restrictions as that to regulate commerce with foreign nations.").[14]
c. Purpose
Both the FCC and the ICC empower Congress to address national interests, but federalism concerns do not constrain the FCC as they do the ICC. The ICC's purpose is to enable Congress to regulate interstate commerce in a federal system. It empowers Congress to regulate on behalf of national economic concerns as long as the regulation does not interfere with "truly local" affairs. Lopez , 514 U.S. at 568, 115 S.Ct. 1624. The ICC permits Congress to ensure that "[i]nterstate trade [i]s not left to be destroyed or impeded by the rivalries of local government," The Shreveport Rate Case , 234 U.S. 342, 350, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), but federalism concerns cabin Congress's power to regulate. "[T]he scope of the interstate commerce power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace *1203 them ... would effectually obliterate the distinction between what is national and what is local ...." Lopez , 514 U.S. at 557, 115 S.Ct. 1624 (quotations omitted).
The FCC's purpose is to enable Congress-and thus the nation-to speak with one voice on international matters. "In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power." Bd. of Trustees , 289 U.S. at 59, 53 S.Ct. 509. Unlike with the ICC, federalism concerns do not limit FCC authority. See Japan Line , 441 U.S. at 448 n.13, 99 S.Ct. 1813 (stating that "Congress'[s] power to regulate foreign commerce" is not limited by "considerations of federalism and state sovereignty").
d. The dissent's view
The dissent questions whether congressional authority is broader under the FCC than the ICC. See Dissent Op. at 1253. It concedes that the FCC is broader than the ICC in certain situations. See id. at 1250. But it disagrees we have such a situation here. First, it argues that the FCC's scope is broader only when applied to restricting state regulation in the dormant FCC context. Second, it argues that the sovereignty of other nations constrains FCC authority.[15]
i. Japan Line and the scope of FCC power
The dissent attempts to limit Japan Line 's statement that the "scope of the foreign commerce power [is] greater" than the interstate power. Japan Line , 441 U.S. at 448, 99 S.Ct. 1813. It appears to argue that any suggestion in Japan Line that the FCC delegates broader authority to Congress than the ICC is limited to the context of that case-a dormant commerce doctrine challenge to state regulation. See Dissent Op. 1248-49. Distinguishing between the FCC's grant of "congressional power to regulate" and the dormant FCC's "restriction on the States" to legislate, id . at 1248, the dissent argues that the Court in Japan Line examined the latter, not the former. But the scope of FCC authority is the same regardless of whether a case involves a challenge to a state's power to regulate commerce or to the federal government's power to legislate. Supreme Court precedent makes this clear.
By way of background, the Constitution does not contain a dormant Commerce Clause. The doctrine derives from the Commerce Clause itself, which provides that "Congress shall have [the] power ... [t]o regulate commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. As to matters within the scope of the *1204 Commerce Clause power, Congress may choose to regulate, thereby preempting the states from doing so, see Gade v. Nat'l Solid Wastes Mgmt. Ass'n , 505 U.S. 88, 96-98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) ; Rice v. Santa Fe Elevator Corp. , 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), or to authorize the states to regulate, see In re Rahrer , 140 U.S. 545, 555-56, 11 S.Ct. 865, 35 L.Ed. 572 (1891) ; Prudential Ins. Co. v. Benjamin , 328 U.S. 408, 429-31, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946).
If Congress is silent-neither preempting nor consenting to state regulation-and a state attempts to regulate in the face of that silence, the Supreme Court, going back to Gibbons , 22 U.S. at 236-37 (1824) (Johnson, J., concurring), and Cooley v. Bd. of Port Wardens , 53 U.S. (12 How.) 299, 318-19, 13 L.Ed. 996 (1851), has interpreted the Commerce Clause to limit state regulation of interstate commerce by applying the negative implications of the Commerce Clause-"these great silences of the Constitution," H.P. Hood & Sons, Inc. v. Du Mond , 336 U.S. 525, 535, 69 S.Ct. 657, 93 L.Ed. 865 (1949) ; see White v. Mass. Council of Constr. Emp'rs, Inc. , 460 U.S. 204, 213, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). Accordingly, the Commerce Clause is both an express grant of power to Congress and an implicit limit on the power of state and local government. See Comptroller of the Treasury of Md. v. Wynne , --- U.S. ----, 135 S.Ct. 1787, 1794, 191 L.Ed.2d 813 (2015) ; Kleinsmith v. Shurtleff , 571 F.3d 1033, 1039 (10th Cir. 2009). The dormant Commerce Clause doctrine extends to state regulation that may conflict with Congress's foreign commerce regulatory authority. See, e.g. , Japan Line , 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336.
When the Supreme Court has considered dormant commerce doctrine challenges to state regulation, it has recognized that the scope of Congress's affirmative powers under the Commerce Clause and the scope of commerce subject to the dormant Commerce Clause are coextensive. See, e.g. , Lewis v. BT Inv. Managers, Inc ., 447 U.S. 27, 39, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980) ; Philadelphia v. New Jersey , 437 U.S. 617, 622-23, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). It follows, contrary to the dissent, that if the Supreme Court, in a dormant Commerce Clause case, recognizes, as it did in Japan Line , that the FCC confers broader authority on Congress than the ICC, then Congress's authority is broader under the FCC in general.
The dissent is correct that the Court in Japan Line "did not say that the term commerce has a broader meaning in the foreign-commerce context," Dissent Op. at 1248, but it did say "the Founders intended the scope of the foreign commerce power to be greater," Japan Line , 441 U.S. at 448, 99 S.Ct. 1813. The Court's statement thus sheds light on the FCC's outer limits for both its grant of congressional authority and its restriction on states.
ii. Sovereignty of other nations
Although the dissent concedes that state sovereignty does not limit the FCC, it "reject[s] the notion that ... the power under the [FCC] to regulate conduct in foreign nations is unconstrained," Dissent Op. at 1253, and suggests that the sovereignty of other nations limits the FCC. The dissent presents no relevant authority-text, history, or precedent-that the sovereignty of foreign nations limits Congress's authority under the FCC.
An enumerated power both confers and constrains legislative authority. See Richard Primus, The Limits of Enumeration , 124 Yale L.J. 576, 578 (2014). Internal limits "are the boundaries of Congress's powers taken on their own terms," id. , that *1205 is, based on the language of the text itself. For example, an internal limit on Congress's power under the Commerce Clause is the meaning of the word "commerce." By contrast, external limits "are affirmative prohibitions that prevent Congress from doing things that would otherwise be permissible exercises of its powers." Id . Federalism and the Bill of Rights, for example, externally limit legislative authority under the Constitution's enumerated powers. See, e.g. , Lopez , 514 U.S. at 557, 115 S.Ct. 1624 ("[T]he scope of the interstate commerce power must be considered in the light of our dual system of government." (quotations omitted) ); New York v. United States , 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) ("[U]nder the Commerce Clause Congress may regulate publishers engaged in interstate commerce, but Congress is constrained in the exercise of that power by the First Amendment.").
First, the FCC is an enumerated power and therefore defines and limits that power by its own terms. The FCC's internal limits derive from the words "commerce," "regulate," and "with foreign nations."[16] The Framers did not think, nor do we, that the FCC conferred "plenary power to police the behavior of Americans in foreign countries." Dissent Op. at 1251. The power to regulate foreign commerce, like all of Congress's enumerated powers, "[is] defined, and limited." Marbury v. Madison , 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803). But because federalism concerns do not apply in the foreign commerce context, congressional authority is broader under the FCC than the ICC.
Second, the dissent's suggestion that the sovereignty of foreign nations is an "external limit" on the FCC finds no traction. No provision in the Constitution restricts the FCC in this manner. Unlike federalism, an integral part of our constitutional structure, and unlike the Bill of Rights, an express set of limits on government power, foreign nation sovereignty appears nowhere in the constitutional scheme-either in the Constitution itself or the cases interpreting it.[17]
*1206 International rules of sovereignty and jurisdiction do not affect the scope of Congress's authority under the Constitution. They concern issues of international law, custom, and politics, not constitutional ones. See, e.g. , Verlinden B.V. v. Central Bank of Nigeria , 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (" The Schooner Exchange made clear ... foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution."). Whether a statute conflicts with a foreign law or policy may implicate international law and politics, not whether Congress may pass such a statute under the FCC.
Moreover, the Court has long recognized Congress's authority to pass extraterritorial laws that apply to conduct in foreign countries. The dissent suggests any law with application in a foreign country "would imply a diminution of [the foreign country's] sovereignty ...." Dissent Op. at 1251 (quoting The Schooner Exch. , 11 U.S. at 136 ). But the Supreme Court has recognized "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States." E.E.O.C. v. Arabian Am. Oil Co. , 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). Indeed, the application of a federal statute "so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power." Blackmer v. United States , 284 U.S. 421, 437, 52 S.Ct. 252, 76 L.Ed. 375 (1932).
Finally, the statute at issue in this case, § 2423(c), does not impinge on the sovereignty of other nations. It does not prevent another country from enforcing its child sex abuse laws against an American traveling there. For example, in Pendleton , 658 F.3d at 301, Thomas Pendleton was first arrested, convicted, and sentenced in Germany-where he had molested a 15-year-old boy-under German law. After he had served his 19 months in a German prison, the United States then charged him under § 2423(c) for his illicit conduct. Id.
iii. Summary
The dissent attempts to argue that congressional authority under the FCC is not broader than under the ICC by (1) restricting Japan Line 's statement about the breadth of FCC authority to the dormant FCC context and (2) suggesting foreign state sovereignty as an external limit on FCC authority. We disagree. As we have shown, the Japan Line statement is relevant, binding, and speaks to the reach of the FCC generally. See Gaylor v. United States , 74 F.3d 214, 217 (10th Cir. 1996) ("While these statements are dicta, this court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings."). And the dissent's foreign state sovereignty theory lacks merit or support.
* * * *
Congressional authority under the FCC is broader than under the ICC. The Founders wanted to boost foreign trade-the early nation's economic engine-through a broad delegation of authority to Congress under the FCC. They did so in the Commerce Clause, distinguishing the ICC and FCC by using the terms "among" and "with," respectively. Though Congress may advance national interests under both clauses, federalism interests limit congressional authority under the ICC and not the FCC.
4. The Lopez Categories in the Foreign Commerce Context
The three Lopez categories provide a useful starting point in analyzing challenges under the FCC. The following explains why the third category applies to this case, traces its evolution in the interstate commerce context, and explains how *1207 it should be analyzed in the foreign commerce context. Because the federalism concerns limiting the third Lopez category do not apply to the foreign commerce context, the substantial-effect analysis is different under the FCC than the ICC. See Bollinger , 798 F.3d at 215 (Without alteration, "the third Lopez category ... [would be] unduly demanding in the foreign context.").
a. The ICC's three categories as a starting point
The dissent agrees that we "can adopt the Interstate Commerce Clause doctrine['s] ... three types of regulation" to consider constitutional challenges under the FCC. Dissent Op. at 1254; see also Pendleton, 658 F.3d at 308 (finding " Lopez 's 'time-tested' framework" suitable for the foreign commerce context). The few Supreme Court decisions about the FCC also describe similar categories-channels, instrumentalities, and activities affecting commerce with foreign nations. See Bd. of Trustees , 289 U.S. at 57, 53 S.Ct. 509 (upholding a tariff under the FCC based on Congress's authority to regulate the movement of goods in foreign commerce); Japan Line , 441 U.S. at 454-55, 99 S.Ct. 1813 (invalidating a state's tax on the "instrumentalities of foreign commerce" under the dormant FCC); Bd. of Trustees , 289 U.S. at 58, 53 S.Ct. 509 (recognizing Congress's authority to legislate under the FCC and "consider the conditions of foreign trade in all its aspects and effects ") (emphasis added).
Although the three Lopez categories "provide a useful starting point in defining Congress's powers under the [FCC]," Bollinger , 798 F.3d at 215, they are not an end point. In light of the FCC's broader grant of authority, we consider the third Lopez category, how it has evolved, and whether its analysis needs to be adapted for application in the foreign commerce context. See id. ; see also United States v. Bredimus , 352 F.3d 200, 204-08 (5th Cir. 2003) (recognizing the FCC's broader grant of authority while also applying the ICC framework); United States v. Cummings , 281 F.3d 1046, 1049 n.1 (9th Cir. 2002) (same).
b. The substantial-effect category is applicable here
To determine which Lopez categories apply to this case, we must consider the nature of the regulation under § 2423(c). In passing this statute, Congress criminalized the combination of "travel in foreign commerce" and "engag[ing] in any illicit sexual conduct." See 18 U.S.C. § 2423(c). The third Lopez category concerns a wide range of statutes that purport to regulate "activities" substantially affecting interstate commerce. See Morrison , 529 U.S. at 609, 120 S.Ct. 1740 ; Lopez , 514 U.S. at 558-59, 115 S.Ct. 1624. Because § 2423(c) regulates the activity of illicit sexual conduct, we analyze its constitutionality under the third category. See Morrison , 529 U.S. at 609, 120 S.Ct. 1740.[18]
c. Evolution of the third Lopez category
This section traces the evolution of the third Lopez category as the foundation to explain how it applies in the foreign commerce context. The Court has developed the third category's jurisprudence in three important cases- Wickard , 317 U.S 111, 63 S.Ct. 82, *1208 Lopez , 514 U.S. 549, 115 S.Ct. 1624, and Morrison , 529 U.S. 598, 120 S.Ct. 1740 -and has applied it in Raich , 545 U.S. 1, 125 S.Ct. 2195, in a manner particularly relevant to this case. Federalism considerations have played a pivotal role.
In Wickard , the Court upheld the Agricultural Adjustment Act's quota for wheat production, which had been enacted to maintain wheat prices, by applying an aggregate-effects analysis to "those activities intrastate which so affect interstate commerce." 317 U.S at 114, 128, 63 S.Ct. 82 (quoting United States v. Wrightwood Dairy Co. , 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726 (1942) ). Under the Act, Roscoe Filburn had exceeded his allotment, which he had harvested for personal consumption, and was fined. Id. at 114-15, 63 S.Ct. 82. Even though his wheat production had only a de minimis effect on interstate commerce, the Court found the cumulative effect of all farmers' home-grown wheat production substantially affected the interstate wheat market and upheld the Act. Id. at 127-28, 63 S.Ct. 82. Through its use of this aggregation analysis, Wickard "ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined authority of Congress under the Clause." Lopez , 514 U.S. at 556, 115 S.Ct. 1624.
Between 1937 and 1995, the Court did not invalidate one federal law under the ICC. See Erwin Chemerinsky, Constitutional Law § 3.4.4 (5th ed. 2015). But in Lopez , 514 U.S. 549, 115 S.Ct. 1624, it struck down the Gun-Free School Zones Act of 1990, which made it a crime to have a gun within 1,000 feet of a school, as exceeding congressional authority under the ICC. Id. at 551, 567-68, 115 S.Ct. 1624. The Court determined the gun legislation attempted to regulate in the third category and concluded that gun possession near schools did not substantially affect interstate commerce. Id. at 559, 561, 115 S.Ct. 1624. It noted that the statute had "nothing to do with commerce" and was "not an essential part of a larger regulation of economic activity," which distinguished this case from Wickard . Id. at 561, 115 S.Ct. 1624 (quotations omitted). Further, the Court pointed out that neither the statute nor its legislative history contained express legislative findings that the regulated activity substantially affected interstate commerce. Id. at 562-63, 115 S.Ct. 1624. Accordingly, "[t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." Id. at 567, 115 S.Ct. 1624.
In Lopez, federalism shaped the outer limit of the substantial-effect ICC analysis. The Court declined to aggregate the noneconomic activity of gun possession near schools. Id. at 561, 115 S.Ct. 1624. It rejected the government's arguments that gun possession near schools would adversely affect students' learning environments, which, in turn, would have a negative effect on the national economy. Id. at 564, 115 S.Ct. 1624. The connection was too tenuous for the Court. To have upheld the statute by "pil[ing] inference upon inference" would mean "there [would] never [ ] be a distinction between what is truly national and what is truly local." Id. at 567-68, 115 S.Ct. 1624. If the Court were to follow such logic, the ICC would grant Congress a general police power over such areas as education, a traditional concern of the states. Id. at 565-66, 115 S.Ct. 1624.
Five years later, the Court in Morrison struck down the Violence Against Women Act of 1994, which authorized victims of gender-motivated crimes to sue for damages. 529 U.S. at 601-02, 120 S.Ct. 1740. Although Congress had made detailed findings that gender-based violence substantially affected interstate commerce, including *1209 deterrence of interstate travel, the Court declined to draw the connection. Id . at 614-15, 120 S.Ct. 1740. It declined to do so because it regarded gender-based violence as noneconomic activity. Id at 617, 120 S.Ct. 1740. The Court discouraged "aggregating the effects of any noneconomic activity." Id. at 613, 120 S.Ct. 1740 (noting that "our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature"). As in Lopez , the Court refused to accept the "but-for causal chain from the initial occurrence of violent crime ... to every attenuated effect upon interstate commerce." Id. at 615, 120 S.Ct. 1740.
The Court said the federalism "concern that [it] expressed in Lopez that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded." Id. at 615, 120 S.Ct. 1740. Were the Court to accept aggregated noneconomic activity, Congress could potentially regulate purely intrastate matters, such as violent crime and family affairs. Id. at 615-17, 120 S.Ct. 1740.
Finally, in Raich , the Court upheld the application of the Controlled Substances Act ("CSA") to the home cultivation and possession of marijuana. 545 U.S. at 21-22, 125 S.Ct. 2195. Even though the CSA contained no particularized congressional findings, the Court determined from the legislative history and the statutory scheme that Congress could reasonably conclude noncommercial marijuana production and possession substantially affects the interstate market for illicit drugs and that the prohibition is an essential part of a broader economic regulation. Id. at 22, 27, 125 S.Ct. 2195. As discussed further below, this case supports upholding § 2423(c).
* * * *
In sum, the Court has limited congressional authority under the third Lopez category due to federalism concerns. In Lopez and Morrison , it refused to aggregate noneconomic activities to determine whether the regulated activity had a substantial effect on interstate commerce. It feared that such reasoning would obliterate the distinction between local and national interests in our system of dual federalism and allow congressional regulation of purely intrastate matters.
d. Adapting the third Lopez category to the FCC
For legislation under the FCC that regulates activity, the federalism constraints developed for ICC challenges do not apply. The Lopez category-three analysis must therefore be modified for the foreign commerce context.
Congressional authority under the third Lopez category extends further in the FCC context. Because the federalism considerations underlying the ICC do not arise in the regulation of foreign commerce, the economic and noneconomic distinction, which otherwise discourages the aggregation of noneconomic activity, is unnecessary.
In Lopez, Morrison , and Raich , the Supreme Court recognized limits on Congress's power under the ICC based on federalism concerns. To preserve "the distinction between what is national and what is local," Lopez , 514 U.S. at 557, 115 S.Ct. 1624, the Court distinguished between commercial and noncommercial activity and between economic and noneconomic activity. It discouraged aggregating noneconomic activities to determine whether an activity has a substantial effect on interstate commerce. These distinctions are therefore tied to the external federalism limit on Congress's ICC power.
Federalism limits do not apply to Congress's FCC power and therefore do not constrain application of the substantial-effect analysis in the FCC context. "It has *1210 never been suggested that Congress'[s] power to regulate foreign commerce could be so limited" by "considerations of federalism and state sovereignty." Japan Line, 441 U.S. at 448 n.13, 99 S.Ct. 1813. The FCC provides Congress broader authority to regulate activity that substantially affects foreign commerce. See id . (collecting cases). Relatedly, the Supreme Court has recognized the need for broader authority because Congress must speak with one unified voice abroad. See Bd. of Trustees , 289 U.S. at 59, 53 S.Ct. 509.
FCC analysis thus does not require the distinction between economic and noneconomic activity. Courts consequently may aggregate both economic and noneconomic activity-and consider congressional findings of substantial effect based on aggregation-in determining whether Congress had a rational basis to determine that an activity substantially affects foreign commerce and is therefore subject to federal regulation.
5. Constitutionality of § 2423(c)
Section 2423(c) is constitutional under the third Lopez category as applied to Mr. Durham. Under the substantial-effect category, we must determine whether Congress had a rational basis for concluding that travel abroad followed by noncommercial, illicit sexual conduct with a minor, "taken in the aggregate, substantially affect[s]" foreign commerce. Raich , 545 U.S. at 22, 125 S.Ct. 2195. We conclude that Congress had such a rational basis.
Congress passed § 2423(c) as an essential part of its broader effort to combat international sex trafficking-specifically sex tourism. Under § 2423(b), prosecuting individuals who traveled abroad to have illicit sex-whether commercial or noncommercial-required intent. Because proving intent was too onerous, Congress omitted intent in § 2423(c) to achieve the broader regulatory goals of § 2423 aimed at international sex tourism. Congress therefore had a rational basis to determine that travel to a foreign country followed by illicit sexual conduct with minors substantially affects the international sex tourism industry.
Section 2423(c)'s (1) legislative history, (2) role in the broader statutory scheme, and (3) jurisdictional hook together support the statute's constitutionality. The Supreme Court's analysis in Gonzales v. Raich lends further support.
a. Section 2423(c)'s legislative history supports rational basis
By 2002, Congress had recognized the problem of sex tourism was growing despite previous efforts to address it. See H.R. Rep. No. 107-525, at 2 ("[C]hild-sex tourism ... is increasing," especially in many "developing countries"). For many developing countries, sex tourism had become a source of income, and "[b]ecause poor countries are often under economic pressure to develop tourism, those governments often turn a blind eye towards [the problem of sex tourism] because of the income it produces." Id. The legislative record contains statements expressing concern that the sex tourism industry "support[s] one of the fastest growing areas of international criminal activity." 149 Cong. Rec. 7,625 (2003) (statement of Rep. Sensenbrenner).
The 2003 PROTECT Act sought to stop this problem. § 105, 117 Stat. at 654. It added a statutory scheme to dismantle sex tourism. See id. In addition to § 2423(c), three of the Act's other provisions also targeted the industry. Section 2423(d) punished sex tourism operators and their businesses; § 2423(e) criminalized conspiracies or attempts to engage in sex tourism; and § 2423(f) defined commercial acts, noncommercial acts, and the production of *1211 child pornography as activities of sex tourism.
One of the PROTECT Act's critical additions was § 2423(c). This provision addressed a problem with one of Congress's previous attempts to curb sex tourism- § 2423(b)'s stringent mens rea requirement. Section 2423(b) required the prosecution to show an individual traveled with the "inten[t]" to engage in illicit sexual contact with minors, which was "difficult to prove." Hearings at 25 (statement of Daniel P. Collins, Associate Deputy Att'y Gen., U.S. Dep't of Justice). Section 2423(c) closed this gap; it targeted "persons who travel to foreign countries to engage in illegal sexual relations with minors" regardless of intent. 149 Cong. Rec. 7,633 (2003) (statement of Rep. Sensenbrenner).
The dissent correctly observes that congressional findings "can inform the analysis" but also are "not dispositive." Dissent Op. at 1260. The dissent also accurately notes that the PROTECT Act did not contain congressional findings on the impact of noncommercial sex on foreign commerce. See id . at 1261. But "the absence of particularized findings does not call into question Congress'[s] authority to legislate." Raich , 545 U.S. at 21, 125 S.Ct. 2195. Courts may look to the legislative history more broadly in determining whether Congress had a rational basis to conclude that an activity substantially affects foreign commerce. See id. at 1251.
b. Section 2423(c) is an essential part of a broader statutory scheme
Section 2423(c) not only bolstered § 2423(b), it joined a long lineage of legislation aimed at sex trafficking. Beginning with the Act of 1907, the United States banned the "importation" of foreign prostitutes into the United States. § 3, 34 Stat. at 899. Congress expanded its efforts to end international sex trafficking by passing the Mann Act in 1910 to prevent interstate trafficking, 36 Stat. 825; the Protection of Children Against Sexual Exploitation Act in 1978 to prevent the trafficking of boys as well as girls, § 3, 92 Stat. at 8; and the Child Sex Abuse and Pornography Act in 1986 to prevent the noncommercial sexual exploitation of children, § 5, 100 Stat. at 3511. The 1994 Violent Crime Control and Law Enforcement Act, § 160001(g), 108 Stat. at 2037, and the 2003 PROTECT Act, § 105, 117 Stat. at 654-adding § 2423(b) and § 2423(c) to 18 U.S.C. § 2423, respectively-were Congress's most recent attempts to combat sex trafficking through criminalization of sex tourism.
The pathway to the enactment of § 2423(c) manifests a purpose to address the foreign commerce problem of the international sex trade. Unlike the gun possession provision in Lopez , which was "not an essential part of a larger regulation of economic activity," 514 U.S. at 561, 115 S.Ct. 1624, Congress viewed § 2423(c) as a necessary part of the broader effort to combat the sex tourism market. It determined that 2423(b)'s gap limited 18 U.S.C. § 2423's efficacy. Thus, in criminalizing illicit sexual conduct abroad, whether commercial or noncommercial and regardless of intent, Congress determined that such activity, in the aggregate, substantially affects foreign commerce. Congress had a rational basis to conclude that the conduct § 2423(c) addresses substantially affects foreign commerce-in this instance, the international sex trade.
The dissent argues that "the great bulk of [the long history of federal legislation governing interstate and international travel for sex offenses] is irrelevant because it does not speak to the specific regulation at issue here." Dissent Op. at 1261. But this history is the predicate for showing that § 2423(c) is an essential part of the broader regulatory scheme. Although *1212 we do not rely on formal legislative findings for this point, we properly rely, as have other courts, on the legislative history leading up to and including the enactment of § 2423(c). See Raich , 545 U.S. at 10-15, 125 S.Ct. 2195 (discussing drug legislation from 1906 to 1970, which "culminated in the passage of" the act containing the CSA); Fullilove v. Klutznick , 448 U.S. 448, 475, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (plurality opinion) (stating "[t]he legislative history of the [statute] shows that there was a rational basis for Congress to conclude that the [regulated activity] ... has an effect on interstate commerce" and that "Congress could take necessary and proper action to remedy the situation"). The legislative history demonstrates that Congress regarded § 2423(c) as an essential part of the broader regulation resulting from a long history of combatting international sex tourism.[19]
c. Section 2423(c)'s jurisdictional element supports rational basis
The dissent recognizes that § 2423(c) contains an "express jurisdictional element" tying § 2423(c) to foreign commerce. Dissent Op. at 1262. In addition to "engag[ing] in illicit sexual conduct," § 2423(c) requires "travel[ ] in foreign commerce" as an element of the offense. 18 U.S.C. § 2423(c). An express element limits the statute's reach by linking the prohibited illicit activity to foreign commerce. See Morrison , 529 U.S. at 611-12, 120 S.Ct. 1740 ; Patton , 451 F.3d at 632-34. The dissent properly points out that "[a] jurisdictional hook is not, however, a talisman that wards off constitutional challenges." See Dissent Op. at 1262 (quoting Patton , 451 F.3d at 632 ). But § 2423(c)'s jurisdictional hook nonetheless points to Congress's explicitly limiting the statute to "foreign commerce" and to having a rational basis for its enactment. Although the presence of a jurisdictional element is "neither necessary nor sufficient," it is "certainly helpful" in determining whether "the prohibited activity has a substantial effect on" foreign commerce. Patton , 451 F.3d at 632.
d. Raich supports rational basis for § 2423(c)
The Supreme Court's 2005 decision in Gonzales v. Raich supports the foregoing analysis. After Lopez and Morrison , Raich was the first Supreme Court case to uphold a federal statute on interstate commerce grounds.
The CSA classified marijuana as a Schedule I drug, making its manufacture, distribution, or possession a criminal offense.
*1213 Raich , 545 U.S. at 14, 125 S.Ct. 2195 ; see 21 U.S.C. §§ 812(c), 841(a)(1). State law allowed California residents Angel Raich and Diane Monson to cultivate or possess marijuana for personal medical purposes. Raich , 545 U.S. at 5, 125 S.Ct. 2195. They challenged § 841(a)(1) of the CSA, arguing it exceeded congressional authority under the ICC as applied to them. Id. at 22, 125 S.Ct. 2195 ; see 21 U.S.C. §§ 812(c), 841(a)(1) (2000). The Court upheld § 841(a)(1) as applied to Ms. Raich and Ms. Monson, finding it was part of a larger regulation of economic activity and that Congress had a rational basis to conclude that home-grown marijuana for medical use substantially affected interstate commerce. Raich , 545 U.S. at 22, 125 S.Ct. 2195 ; see 21 U.S.C. § 812 (2000) (CSA section categorizing controlled substances); id. §§ 821-830 (CSA sections specifying requirements for registering, producing, labeling, packaging, and recordkeeping for controlled substances).
The Court upheld the CSA despite the lack of a congressional finding concerning the impact of noncommercial marijuana cultivation on interstate commerce. Raich , 545 U.S. at 21, 125 S.Ct. 2195. The Court stressed that it need only determine whether Congress had a "rational basis" for determining that these activities taken in the aggregate substantially affect interstate commerce. Id. at 22, 125 S.Ct. 2195. It had "no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." Id. The Court determined that the provision is part of the CSA's larger regulatory scheme that regulated the market for controlled substances. Id. at 15, 20-21, 125 S.Ct. 2195. Section 841(a)(1) was one part of the CSA, which classifies drugs into five schedules, each with a distinct set of controls. Id. at 13-14, 125 S.Ct. 2195. The CSA's purpose is to control the supply of and demand for both legal and illegal drugs. See id. at 19, 125 S.Ct. 2195. Thus, the Court determined that personally cultivated marijuana for medical purposes, taken in the aggregate, substantially affected the illicit market for drugs, and was subject to regulation under the ICC. Id. at 22, 28-29, 125 S.Ct. 2195.[20]
Two aspects of the Raich analysis are noteworthy.
First, the Court observed that the CSA was the product of decades of legislation.
*1214 Congress "set out to enact legislation that would ... provide meaningful regulation over legitimate sources of drugs to prevent diversion into illegal channels." Id. at 10, 125 S.Ct. 2195. Like Congress's early attempts to regulate sex trafficking, Congress attempted to regulate the national drug market early on, passing the Pure Food and Drug Act of 1906 and the Harrison Narcotics Act of 1914. Id. It also attempted to regulate the market for marijuana with the Marihuana Tax Act in 1937. Id. at 11, 125 S.Ct. 2195. From these piecemeal attempts, Congress finally passed the Comprehensive Drug Abuse Prevention and Control Act of 1970-which contained the CSA-to regulate the illegal and legal drug markets. Id. at 10, 125 S.Ct. 2195.
Congress followed a similar course in passing the PROTECT Act, building on previous attempts to regulate the international market for sex trafficking. Beyond criminalizing the transport of prostitutes under the Mann Act, for example, the PROTECT Act attempted to address sex tourism comprehensively. It also closed gaps by targeting sex tourism operators and not requiring intent for travelers who engage in illicit sex. Just as legislative lineage supported a rational basis for congressional action in Raich, it also does so for § 2423(c).
Second , the Court in Raich examined the home-grown marijuana provision within the broader statute and recognized that it was part of the CSA's larger scheme to regulate commerce. Id. at 23, 125 S.Ct. 2195 (noting the CSA was a "valid statutory scheme" regulating the illicit drug market). It was "of no moment" that this larger scheme both envisioned and captured some purely intrastate activity. Id. at 22, 125 S.Ct. 2195. Because § 841(a)(1) was one component of a regulatory framework, the Court "refuse[d] to excise individual components of that larger scheme." Id. Thus, the Court upheld the CSA's regulation of noncommercial cultivation of medical marijuana as a valid part of a larger scheme to regulate the controlled substances market.
Similarly, § 2423(c) is part of the PROTECT Act's larger scheme to combat sex tourism. Congress passed § 2423(c) as a vital component to regulate the illicit international market for sex. The § 2423 provisions work together to curb the trafficking and sexual exploitation of minors abroad. Section 2423(a) targets the trafficking of minors across state and international borders; section 2423(b) targets those who travel abroad with the intent to engage in illicit sexual acts with minors; section 2423(c) targets those who travel without intent to engage in such acts; and § 2423(d) targets those who operate businesses that facilitate such illicit sexual conduct abroad. Together, the provisions curb the supply and demand in the sex tourism industry. That § 2423(c) captures intranational, noncommercial activity is "of no moment," see id. at 22, 125 S.Ct. 2195, because it is a part of a statutory structure aimed at regulating foreign commerce-the international sex tourism industry.[21]
*1215 e. Rational basis standard
Rational basis is a deferential standard. The dissent mistakenly suggests that because the regulated activity must have a substantial effect on commerce and because noncommercial sex is noneconomic, such an effect is impossible. See Dissent Op. at 1258-59. The dissent criticizes the government for its failure to show that "noneconomic sex abuse will affect the market in commercial sex trafficking," id . at 1259, or that the "regulation is 'an essential part' of the regulation of commercial sex tourism," id . at 1260. It demands "data [ ] that [show] prosecutions of noncommercial child sexual abuse reduce the incidence of commercial abuse" because noncommercial sex is not a "fungible commodit[y]." Id .[22]
But under the proper standard of review, "[w]e ask not whether, as judges, we believe the challenged statute has a substantial effect on interstate commerce, but whether Congress could reasonably have thought so." Patton , 451 F.3d at 625. As the Court emphasized in Raich : "[W]e stress that the task before us is a modest one. We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." Raich , 545 U.S. at 22, 125 S.Ct. 2195. Here, the legislative history, the overall statutory scheme, and jurisdictional hook all evince that Congress had a rational basis for concluding that, in the aggregate, Americans who travel abroad and have noncommercial sex with minors substantially affect the international sex tourism market.[23] Congress determined, after years of experience with the evolving legislative framework, that it needed § 2423(c) to complete the package. We cannot say this choice was unreasonable.
6. Legal Landscape
Both of the circuits that have examined the constitutionality of § 2423(c)'s criminalization of noncommercial illicit sexual conduct abroad under the FCC have upheld it. See Bollinger , 798 F.3d at 218 (the Fourth Circuit upholding § 2423(c) because of its "demonstrable" effect on foreign commerce);
*1216 Pendleton , 658 F.3d at 311 (the Third Circuit upholding § 2423(c) because of its express connection to the channels of foreign commerce); see also United States v. Flath , 845 F.Supp.2d 951, 956 (E.D. Wis. 2012) (upholding under the FCC); United States v. Martinez , 599 F.Supp.2d 784, 808 (W.D. Tex. 2009) (upholding under the FCC and the necessary and proper clause). But see United States v. Al-Maliki , 787 F.3d 784, 791-92 (6th Cir. 2015) (not deciding the issue, but expressing doubt about § 2423(c)'s constitutionality under the FCC).[24]
Two district court opinions in the District of Columbia have held otherwise. See United States v. Reed , No. CR 15-188, 2017 WL 3208458, at *14 (D.D.C. July 27, 2017) (unpublished) (finding § 2423(c)'s application to noncommercial conduct unconstitutional under the FCC); United States v. Park , 297 F.Supp.3d 170, 179 (D.D.C. 2018) (using Reed , 2017 WL 3208458, to come to the same conclusion). But, unlike here, these cases concerned individuals charged under § 2423(c)'s "residing clause." See 18 U.S.C. § 2423(c) ("Any United States citizen ... who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country , and engages in any illicit sexual conduct...." (emphasis added) ). The district courts lacked a jurisdictional hook to "foreign commerce," which is present in our case. See, e.g. , Reed , 2017 WL 3208458, at *12. Moreover, the district courts emphasized the sexual abuse at issue was noneconomic and its connection to international sex tourism was too attenuated to have a "substantial effect" on foreign commerce. See, e.g. , id. In coming to this conclusion, they focused on a lack of particularized legislative findings and history. As explained above, the Supreme Court has never required "particularized findings," and such a limited focus overlooks the legislative history laid out in this opinion and § 2423(c)'s place in a broader regulatory scheme. Raich , 545 U.S. at 21, 125 S.Ct. 2195 ; see also Heart of Atlanta Motel, Inc. v. United States , 379 U.S. 241, 252, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (upholding the Civil Rights Act even without congressional findings).
7. Conclusion
In passing § 2423(c), Congress had a rational basis to conclude it was regulating activity that substantially affects foreign commerce. In particular, it could reasonably decide that foreign travel followed by noncommercial sex with minors-in the aggregate-substantially affects the international market for sex tourism. We therefore uphold § 2423(c) as applied to Mr. Durham as a permissible exercise of congressional authority under the FCC.
Section 2423(c)'s legislative history, place in the broader regulatory scheme, and jurisdictional hook indicate Congress's rational basis for determining the activity's substantial connection to foreign commerce. In 2002, the congressional sponsors of § 2423(c) recognized that the sex tourism industry was expanding and that the "growing ... industry" fueled human sex trafficking, a massive illicit international market. 149 Cong. Rec. 7,625 (2003) (statement of Rep. Sensenbrenner). Congress attempted to curtail such markets with the PROTECT Act in 2003. Section 2423(c) -and its accompanying provisions-target sex tourists and operators, commercial and noncommercial acts, and travel with and without intent to engage in illicit sexual acts. Specifically, § 2423(c) closed the enforcement *1217 gap created by § 2423(b)'s intent requirement. Congress had a rational basis to conclude that, without § 2423(c), the failure to capture such behavior would substantially affect foreign commerce-here sex tourism.
Thus, under the FCC, Congress permissibly exercised its authority in passing § 2423(c).
B. Issue Two: Brady Claim
In his supplemental motion for new trial under Federal Rule of Criminal Procedure 33, Mr. Durham alleged that the Government suppressed evidence favorable to the accused in violation of Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court denied the motion, and Mr. Durham appeals the Brady ruling. We affirm because Mr. Durham has not shown by a preponderance of the evidence that nondisclosure of the evidence prejudiced his case.
1. Additional Procedural Background
a. Trial testimony
At trial, Dr. Alawiya Abdulkadir Mohamed testified about the victims' medical records. ROA, Vol. 12 at 1178 (TT 564). In June 2014, Dr. Abdulkadir supervised the outpatient clinic in Kenya where the victims were examined. Id. at 1179-80 (TT 565-66). Although she did not examine the children, she reviewed the Post Rape Care ("PRC") forms prepared by the clinician who did on June 18, 2014. Id. at 1182-83, 1188-89 (TT 568-69, 574-75). Dr. Abdulkadir prepared Medical Examination Reports based on the PRCs. Id. at 1183 (TT 569). Her testimony included the following:
Q. [C]an you explain to the jury what the hymen is on a female?
A. Okay. So the hymen is a membrane which covers the vagina and it's-it doesn't fully cover the vagina, so there's a portion which is slightly open to allow the menstrual flow. So it's a membrane which is usually most people get born with it and it's usually present in kids and-yes.
Q. If a hymen is perforated, what does that mean?
A. Okay. We-the hymen could be perforated due to several reasons. One of them would be due to sexual assault. The others would be due to extraneous exercises involving the groin region or falling astride, like falling on a wall, having bicycle accidents and horseback riding. Those are the common things which break the hymen.
Id. at 1185-86 (TT 571-72). She further testified that five of the six girls had a perforated hymen and that would not be normal for girls their ages. Id. at 1187-88 (TT 573-74). On cross-examination Dr. Abdulkadir testified:
Q. Now, you talked a lot about a perforated hymen?
A. Yes.
Q. Now, a hymen-a hymen can be in very different shapes; is that right?
A. True.
Q. It can be flat; is that right?
A. Yes.
Q. It can be round, some are bigger and some are smaller?
A. Bigger in terms of?
Q. Of their size. Some women will have a bigger hymen than others?
A. It's a membrane, so it's more thickness than bigger, it's not-
Q. More thickness?
A. The dimensions are not three-dimensional.
Q. If a woman has not started menstruating yet, would her hymen-it's called non-estrogenized; is that right?
A. Yes.
*1218 Q. And that means that the hymen is more rigid and hard?
A. Yes.
Q. And so that would be the situation for children who have not yet hit their menstrual cycle; is that right?
A. Yes.
Id. at 1198-99 (TT 584-85); see also id. at 1220-21 (TT 606-07) (answering in the negative when asked if a 7, 6, 13 or 11-year-old should have a perforated hymen).
Dr. Abdulkadir testified that even if the assaults occurred a month before the examinations, the exams were conducted because "[t]he hymen doesn't come back. So we're looking out for the hymen. It doesn't regenerate, so-." Id. at 1214 (TT 600), see also id. at 1221 (TT 607). She agreed that "there's no way you can be certain that Mr. Durham committed the assaults." Id. at 1215 (TT 601); see also id. at 1222 (TT 608).
Later in the trial, the defense called Lisa Dunson, a sexual assault nurse examiner, who was present in the courtroom when Dr. Abdulkadir testified. Id. at 1581, 1585 (TT 967, 971). Nurse Dunson testified that all hymens have a hole in them, that preadolescent children do not usually have physical injuries following a sexual assault, and that hymens have different shapes and sizes. Id. at 1594-96 (TT 980-82). As for the term "perforated hymens," she testified:
Q. Now, what about-what was the term used on the medical records as far as the hymen; do you recall?
A. Yes. They used the word "perforated."
Q. And the examiner who conducted-who viewed the children didn't testify. What in your mind is-does that mean, "perforated hymen"?
A. Truthfully, I don't know. We don't use that term anymore. It hasn't been used since I've been doing exams, which is since 2003. I think when the general population hears the word "perforated," we think of a tear or a hole that's not supposed to be there, so I don't know what that means because I don't use that.
***
Q. So "perforated" could mean a tear, it could mean just the natural opening of the hymen. We don't know at this point; is that right?
A. I wouldn't speculate what that means.
Id. at 1596-97 (TT 982-83). She conceded that the term "perforated hymen" might be commonly used elsewhere, and that it appears in the Kenyan protocol for sexual assault examinations. Id. at 1621, 1626 (TT 1007, 1012). Although the term had not been used since she started doing examinations in 2003, she said it was once used in the United States. Id. at 1626 (TT 1012).
Nurse Dunson testified, contrary to Dr. Abdulkadir, that hymen tissue can repair itself. Id. at 1598 (TT 984). She had reviewed an article that said "minor abrasions and lacerations usually heal within about three to four days." Id . She said that "statistics say that 90 to 95 percent of all children exams, regardless of what the disclosure, are normal." Id. at 1599 (TT 985). She also testified that in examinations of children who have been sexually assaulted, "there usually isn't an injury. Children are usually not injured." Id. at 1616 (TT 1002). She also agreed that a "positive finding" for five of the six children would be unlikely. Id. at 1617-18 (TT 1003-04). She said that an acute injury of the hymen is from blunt force trauma. Id. at 1625 (TT 1011).
b. Supplemental motion for new trial
On October 2, 2015, Mr. Durham moved for leave to file a supplemental motion for a new trial, which was granted, and he filed his memorandum in support on October 27. Mr. Durham alleged the Government *1219 violated his right to due process under Brady because the prosecutor in the case, Assistant United States Attorney ("AUSA") Robert Don Gifford, failed to disclose evidence favorable to the accused. ROA, Vol. 3 at 505-06.[25]
The supplemental motion stemmed from two memoranda that the Oklahoma County District Attorney, David Prater, sent to the district court after the trial. On September 28, 2015, the court sent them to the parties' counsel. ROA, Vol. 3 at 812. The memoranda recounted telephone conversations on the evening of June 15, 2015, the day the prosecution rested its case-in-chief.
On August 16, 2015, Oklahoma County Assistant District Attorney ("ADA") Gayland Geiger wrote the first memorandum. It described his June 15 telephone conversation with AUSA Gifford:
I asked Gifford about the facts of his case. He said there were 5 or 6 or 7 (don't remember the exact number) of female victims ages 6 to 14. All but one of them had a perforated hymen. He indicated this evidence was presented by the government's medical witness.... A reviewing doctor actually testified to the perforated hymens. He said as best as they could tell, the sexual assault exams were done about 6 weeks after the abuse occurred. He said the defense was calling a sexual assault expert, and he did not know what the expert would say.... I told him that I have not heard the term perforated hymen. I told him it is very unusual to have physical findings in children; that it is extremely unusual to have physical findings 6 weeks after the event; that even if there were an injury, it would have healed in that amount of time; and, that it is extremely unusual and almost unheard of to have physical findings in 5 of 6 or 6 of 7 victims. I called [Physician Assistant] Donaldson and joined her for a three-way conversation with Gifford. She told him the same things. We together told him that there are legitimate medical studies showing even pregnant girls have normal exams. Donaldson explained the anatomy and that a perforated hymen is a normal finding.... I expressed my opinion to him that [ ] he cannot cross examine the defense expert in good faith on those issues, because medical research and the legitimate medical community share those opinions. I encouraged him to instead contact Dr. Brown to be a rebuttal witness to use to say even if the African exams are incorrect, it still does not mean sexual abuse did not occur.
Id. at 813.
At ADA Geiger's request, Dr. Ryan Brown, Chair of the Child Protection Committee at the University of Oklahoma Children's Hospital, wrote the second memorandum about his discussions with AUSA Gifford on the night of June 15:
We had discussed what a performed hymen meant to me. I had told him that to me, it meant that the hymen had a hole in it, which is normal. I didn't know if that was what the African physician had meant by it, but we don't normally use that language to describe hymens here in the US.... I had also stated that an imperforate hymen, is still normal, but is actually not a common finding. He had stated to me that the African physician had stated that he had found 5 of the 6 young ladies in the case to have perforated hymens and that the physician was calling that an abnormal finding. I *1220 spoke with him that actually it is rare to have findings in sexual abuse exams, especially in your preadolescent children. I told him that about 95% of the time we will have a normal finding, and of the 5%, 2/3 of the evidence is found on the clothing or bed. I also reiterated that a normal exam does not rule in or rule out a sexual encounter. Also, that it would be quite rare for 5 individuals to have the same findings on exam in regards to a sexual assault, unless the perpetrator was using some type of instrumentation, I also spoke about how quickly findings on exams can heal, IF there were findings to begin with.... Again I stated that it would be a small chance to have abnormal findings on a preadolescent sexual abuse exam, and to have multiple children with the same finding, other than normal, would be rare. I also stated again that time is of the essence and rape exams done after a week could be normal even if there was a finding to begin with since the tissue heals so quickly.
Id . at 816.
In his supplemental motion, Mr. Durham argued that AUSA Gifford had failed to disclose the information he learned in his June 15, 2015 conversations in violation of Brady . In opposition, the Government argued there was no Brady violation because the information at issue was available to the defense and because it was not material in light of Nurse Dunson's testimony.
The district court denied the Brady claim based on the Government's second argument. It first said that, although the information provided by Dr. Brown was available from other sources, the fact it came from Dr. Brown was not. But the court concluded that the Government's failure to apprise Mr. Durham of Dr. Brown's statements did not deprive him of a fair trial because of Nurse Dunson's "vigorous opposition" to Dr. Abdulkadir's testimony. ROA, Vol. 3 at 810.[26]
2. Analysis
a. Standard of Review
"Our review of a Brady claim asserted in the context of a Rule 33 motion for a new trial is de novo, with any factual findings reviewed for clear error." United States v. Torres , 569 F.3d 1277, 1281 (10th Cir. 2009) ; see United States v. Garcia , 793 F.3d 1194, 1205 (10th Cir. 2015). "[W]hether suppressed evidence is material is a mixed question of law and fact which we also review de novo." Douglas v. Workman , 560 F.3d 1156, 1172 (10th Cir. 2009).
b. Legal Background
Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest *1221 of justice so requires." Mr. Durham's Rule 33 motion was based, in part, on an alleged Brady violation.
In Brady , the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. The Court later held that the duty to disclose such evidence applies even when the accused has made no request. United States v. Agurs , 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Brady applies to impeachment evidence, or evidence affecting witness credibility, "[w]hen the reliability of a given witness may well be determinative of guilt or innocence." Giglio v. United States , 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (quotations omitted); see also United States v. Bagley , 473 U.S. 667, 676-77, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
To establish a Brady violation, "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Strickler v. Greene , 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ; see United States v. DeLuna , 10 F.3d 1529, 1534 (10th Cir. 1993). The defense needs to establish these elements by a preponderance of the evidence. McCormick v. Parker , 821 F.3d 1240, 1246 (10th Cir. 2016). In Strickler , the Court said the third element concerns "whether petitioner has established the prejudice necessary to satisfy the 'materiality' inquiry." 527 U.S. at 282, 119 S.Ct. 1936. The evidence is material and its nondisclosure is prejudicial "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley , 473 U.S. at 682, 105 S.Ct. 3375 ; see also Kyles v. Whitley , 514 U.S. 419, 433-434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ; Garcia , 793 F.3d at 1205.
c. No prejudice for a Brady violation
The information that AUSA Gifford learned from the June 15 conversations was favorable to the defense, and he did not disclose the conversations to defense counsel.[27] But even assuming Mr. Durham could show the first two elements of Brady were met,[28] he has not established prejudice because the information was not material in light of Nurse Dunson's testimony. We therefore affirm the district court's denial of Mr. Durham's Brady motion.
AUSA Gifford's June 15, 2015 conversations with ADA Geiger, Ms. Donaldson, and Dr. Brown were was not material in light of the trial record. On June 16, Mr. Durham called Nurse Dunson to testify. She said there are "usually not injuries with children" following a sexual assault, ROA, Vol. 12 at 1598 (TT 984), that a physical finding was less likely if the exam occurred five days after an assault, id . at 1597 (TT 983), that "minor abrasions and lacerations usually heal within about three to four days," id. at 1598 (TT 984), that "perforated hymen" was an antiquated term no longer in use, id. at 1626 (TT
*1222 1012), and that "statistics say that 90 to 95 percent of all children exams, regardless of what the disclosure, are normal,"id. at 1599 (TT 985). Nurse Dunson therefore testified to the information AUSA Gifford learned during his June 15 conversations, including the rarity of physical findings in cases of child sexual assault and that lacerations to the hymen heal quickly. ROA, Vol. 3 at 813-15.
As the district court said, Mr. Durham has not shown prejudice due to "Ms. Dunson's vigorous opposition to Dr. Abdulkadir's testimony." ROA, Vol. 3 at 810. The jury received the information from Mr. Durham's own expert, Nurse Dunson. She provided testimony that was the same as or comparable to the information from Dr. Brown about perforated hymens, the likelihood of findings during sexual abuse examinations, that normal findings do not rule out sexual assault, the rarity of the same findings in multiple children, and the speed of healing. Compare ROA, Vol. 3 at 816 with ROA, Vol. 12 at 1595-96, 1598-99, 1616-18, 1626, 1631 (TT 981-82, 984-85, 1002-04, 1012, 1017).
Mr. Durham cannot show prejudice because Nurse Dunson rebutted each of Dr. Abdulkadir's points that may otherwise have been impeached by the information that AUSA Gifford learned in the June 15 conversations. Indeed, Mr. Durham admits on appeal that Nurse Dunson's testimony "largely rebutted Dr. Abdulkadir's claims." Aplt. Br. at 23-24. Taking the differences between the experts' opinions into account, we still conclude that there was no Brady violation because Mr. Durham has not shown "a reasonable probability that, had [Dr. Brown's information] been disclosed to the defense, the result of the proceeding would have been different." Bagley , 473 U.S. at 682, 105 S.Ct. 3375.
We therefore affirm the district court's denial of the part of the supplemental motion for a new trial alleging a Brady violation.
C. Issue Three: Mr. Durham's Statements about Child Pornography and Homosexuality
Mr. Durham argues that the district court's admission of his out-of-court statements that he had struggled with child pornography and homosexuality violated (1) Federal Rule of Evidence 404(b) because the statements were used to show propensity to commit the charged offenses, (2) Federal Rule of Evidence 401 because the statements were irrelevant, and (3) Federal Rule of Evidence 403 because the statements were unfairly prejudicial. Because the district court did not abuse its discretion, we affirm.
1. Standard of Review
We review the admission of evidence for abuse of discretion "and will not reverse if the district court's ruling falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious or whimsical." United States v. Willis , 826 F.3d 1265, 1270 (10th Cir. 2016) (quotations omitted).
2. Additional Factual Background
a. Evidence about child pornography and homosexuality
The prosecution presented evidence at trial about two separate times when Mr. Durham said he had struggled with child pornography or homosexuality.
First, Ms. Wambugu, Ms. Menja, Mr. Mutonga, and Mr. Jeffries testified about statements made at the June 13, 2014 meeting at Upendo. They each said that during the meeting, Mr. Durham went outside to talk to Ms. Wambugu, ROA, Vol. 12 at 721, 827, 998, 1132, and that, upon returning with Ms. Wambugu to the sitting *1223 room, Mr. Durham said he had struggled with child pornography and homosexuality. Id. at 724, 828, 999. According to Ms. Wambugu, Mr. Durham said he could not remember molesting the children, but could "only remember ... he ha[d] been struggling with child pornography and homosexuality." ROA, Vol. 12 at 724 (TT 110). Ms. Menja testified that Mr. Durham "said that he needed help because he has been struggling with child pornography and homosexuality." Id. at 828 (TT 214). Mr. Mutonga testified that Mr. Durham said he "needed to apologize, he needed to be forgiven," and that he "struggled with homosexuality and child pornography." Id. at 1133 (TT 519). In his testimony, Mr. Durham admitted saying at this meeting that he struggled with homosexuality, but denied mentioning child pornography. Id. at 1848-49 (TT 1234-35).
Second, the jury was shown the Seagull Confession Videos that were recorded on June 17. At the beginning of one of the videos, Mr. Durham stated he could not remember what happened. Ms. Menja responded that if Mr. Durham did not have a memory of the events and could not describe them, they would "want the police [t]here to deal with it first." Gov't Exh. 4 at 1:03-1:10. Mr. Durham said, "I've told you the truth, I've told you that I've struggled with this my whole life...." id. at 1:32-1:37, and described a "temptation to touch children and to be with other men," id. at 1:57-2:01.
b. District court rulings
Before trial, Mr. Durham moved to exclude evidence about his alleged struggles with "wanting to touch children"[29] or "erotic pornography," ROA, Vol. 2 at 282, and also moved to exclude evidence "regarding [his] sexual history and sexual orientation," id. at 345. The district court denied these motions at a pre-trial hearing. On the pornography, the Government argued the statement was "inherent as a part of [Mr. Durham's] confession," and the court seemed to agree. ROA, Vol. 12 at 523. The court admitted the statements about homosexuality because "when a defendant is ostensibly explaining what he's done, that ... would be very relevant and probative and admissible." Id. at 531.
When Ms. Wambugu testified at trial about the June 13 statements, the court asked if Mr. Durham would like a limiting instruction to the jury that Mr. Durham was "not on trial for child pornography or homosexuality." Id. at 725 (TT 111). Defense counsel declined, saying he "d[idn't] see how there c[ould] be any limiting instruction that cure[d] [the testimony's] prejudice," so none was given. Id. at 725-26 (TT 111-12).
Mr. Durham based his motion for a new trial in part on the admission of the evidence about his statements concerning child pornography and homosexuality. See ROA, Vol. 3 at 316-324. The district court ruled he was not entitled to a new trial based on the admission of the statements. Id. at 785. It said the statement about child pornography was relevant "because it was offered by Defendant as a justification for the behavior of which he was accused," and found any prejudicial effect of the evidence did not substantially outweigh its probative value. ROA, Vol. 3 at 786. As to the statements about homosexuality, the court found "that the potential prejudice of admitting Defendant's statements did not outweigh their probative value." Id. at 785. "[D]espite the potential for prejudice to Defendant ... the evidence herein was relevant, largely because it was offered by Defendant as some type of explanation or justification when he was accused of engaging *1224 in inappropriate sexual activity with children at Upendo." Id. at 785-86.
3. Legal Background
a. Rule 404(b)
Federal Rule of Evidence 404(b) prohibits evidence of a "crime, wrong, or other act ... to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."
"When we apply Rule 404(b), we distinguish between evidence that is extrinsic or intrinsic to the charged crime." United States v. Kupfer , 797 F.3d 1233, 1238 (10th Cir. 2015). Rule 404(b) prohibits evidence of "other acts," "but this rule does not cover evidence that is considered intrinsic" to the charged crime. Id. (quotations omitted). Evidence is intrinsic when it is "directly connected to the factual circumstances of the crime and provides contextual or background information to the jury." Id. (quotations omitted).
b. Rules 401 and 402
Evidence is admissible only if it is relevant. Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and ... the fact is of consequence in determining the action." Fed. R. Evid. 401.
c. Rule 403
Otherwise admissible evidence may be excluded under Rule 403 if its "probative value is substantially outweighed by ... unfair prejudice." Fed. R. Evid. 403. " 'Unfair prejudice' within its context means an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." United States v. Silva , 889 F.3d 704, 712 (10th Cir. 2018) (quoting Fed. R. Evid. 403 advisory committee note to 1972 proposed rules). "[A]s to a criminal defendant, [it] speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States , 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).
"The district court has considerable discretion in performing the Rule 403 balancing test, but exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." Silva , 889 F.3d at 712 (quotations omitted).
4. Analysis
The district court did not abuse its discretion when it determined the challenged statements were (1) intrinsic to the charged crimes, (2) relevant, and (3) not unfairly prejudicial.
a. Rule 404(b)
The district court did not abuse its discretion by holding the statements were intrinsic rather than Rule 404(b) evidence.[30] Although the district court did not use the word "intrinsic," it viewed the statements as intrinsic to the charged crimes because they were part of Mr. Durham's denials and eventual confession to the crimes. See ROA, Vol. 12 at 523, 531; ROA, Vol. 3 at 785-86.
Mr. Durham made both statements at issue when the Upendo volunteers confronted *1225 him about the children's allegations. The statements were intrinsic evidence because they provided "contextual or background information" regarding his actions when confronted with the allegations against him and his confession at the Seagull on June 17. Kupfer , 797 F.3d at 1238.
The fact that the statements were made after the charged conduct had occurred does not make them extrinsic. For example, in United States v. Bajoghli , 785 F.3d 957 (4th Cir. 2015), the Fourth Circuit held it was an abuse of discretion for the district court to exclude evidence of a defendant's post-scheme conduct, id. at 966. In that case, the government sought to introduce evidence that the defendant had halted his fraudulent scheme after he was interviewed by law enforcement. Id. at 964. The court held this evidence was admissible intrinsic evidence, not 404(b) evidence, because it showed the defendant's knowledge and intent to defraud. Id. at 965. Although Mr. Durham made his statements after the charged conduct, they were nonetheless intrinsic evidence because they "bear[ ] directly" on his response to the allegations against him. Id. at 964 (alteration and quotations omitted).
The district court did not abuse its discretion by holding the statements were intrinsic evidence and not subject to the Rule 404(b) bar.
b. Rules 401 and 402
As intrinsic evidence, the statements satisfied Rule 401's "any tendency" relevance standard. See Daubert v. Merrell Dow Pharm ., 509 U.S. 579, 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (calling Rule 401's standard as "liberal"). In the face of allegations that he had molested children and that two of his alleged victims were male, Mr. Durham's statements that he had struggled with both child pornography and homosexuality provided context and explanation, making them relevant and admissible under Rules 401 and 402. Mr. Durham has not presented any persuasive argument on appeal that the district court abused its discretion in determining the statements not only constituted intrinsic evidence but also met "the minimal relevance requirements of Rule 401." United States v. Spence , 721 F.3d 1224, 1229 (10th Cir. 2013) ; see United States v. Breton , 740 F.3d 1, 14 (1st Cir. 2014) (recognizing "the low bar of relevancy set out in Rule 401").
c. Rule 403
The district court did not abuse its discretion in admitting the statements over Mr. Durham's Rule 403 challenge.
As described, the statements were probative as intrinsic to Mr. Durham's explanation for his conduct. The district court acted within its discretion to determine that the potential for unfair prejudice did not substantially outweigh the statements' probative value.[31]
We affirm the district court's admission of the statements about struggles with child pornography and homosexuality.
D. Issue Four: Prosecutorial Misconduct
Mr. Durham contends that the district court erred when it denied the part of his Rule 33 motion for a new trial which alleged that the Government made improper propensity statements about his struggle with homosexuality. Aplt. Br. at 34-39. The statements occurred during the Government's *1226 cross-examination of Mr. Durham and its closing argument. Because Mr. Durham failed to contemporaneously object to the alleged improper statements on prosecutorial misconduct grounds, we review for plain error. We find none and affirm the district court's denial of Mr. Durham's motion for a new trial on this issue.
1. Standard of Review
"Ordinarily, we review the trial court's decision to grant or deny a new trial for abuse of discretion, and will reverse the denial of a motion for a new trial only if the trial court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." United States v. Toro-Pelaez , 107 F.3d 819, 828 (10th Cir. 1997). But where the defendant "failed to contemporaneously object regarding the ... reasons he asserts as justification for a new trial[,] ... we ... may only reach the issue if we find plain error." Id.
"Plain error occurs when there is (1) error, (2) that is plain, which (3) affects the defendant's substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Fleming , 667 F.3d 1098, 1103 (10th Cir. 2011) (quotations omitted). "To show that an error affected his substantial rights, [the defendant] must establish a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." United States v. Uscanga-Mora , 562 F.3d 1289, 1295 (10th Cir. 2009) (quotations omitted). "When evaluating allegedly inappropriate remarks of counsel for plain error, we must view the remarks in the context of the entire trial." Fleming , 667 F.3d at 1103 (quotations omitted).
2. Additional Factual Background
As described in Issue Three above, the jury heard evidence that Mr. Durham had twice stated that he struggled with homosexuality. We now provide additional factual background on the two alleged instances in which the prosecution made improper propensity arguments relating to these statements.
a. The Government's cross-examination of Mr. Durham
During the cross-examination of Mr. Durham, the prosecutor questioned him about his struggle with homosexuality. After replaying part of one of the Seagull Confession Videos, the prosecutor asked Mr. Durham: "[W]hat do you struggle with?" ROA, Vol. 12 at 1999 (TT 1385). Mr. Durham's counsel objected to the question on the ground that "this is repetitious," and the trial court sustained the objection. Id. The prosecutor continued: "Mr. Durham, you struggle with homosexuality?" Id. Mr. Durham answered, "I did, yes," after which his counsel objected, again because "[i]t's repetitious." Id. The Court again sustained the objection. Id. The prosecution resumed playing the Seagull Confession Video, and defense counsel "object[ed] to continually replaying it after Your Honor has ruled." Id. The court sustained the objection, remarking that "[i]t has been played before." Id. at 2000 (TT 1386).
b. The Government's closing argument
During rebuttal closing argument, the prosecutor twice referred to Mr. Durham's "life-long struggle with touching children and homosexuality." Id. at 2087 (TT 1473), 2096 (TT 1482).
First, the prosecutor argued:
There is always a first victim to a crime, a first time when you go to Upendo, long before your mother does, 24 days, a first *1227 time when you ask to stay at Upendo among the little children that you're going to be with ... while you have a life-long struggle with touching children and homosexuality.
Id. at 2087 (TT 1473).
Second, the prosecutor argued:
[Mr. Durham] insisted on going to Kenya weeks before anyone else. He insisted on living at Upendo when he knew he had a life-long struggle with touching children and homosexuality. He put himself there knowing he couldn't resist, knowing it was all likelihood that he would get what he always wanted, and that was to be with children.
Id. at 2096-97 (TT 1482-83).
Mr. Durham's counsel did not object to either of these statements. See ROA, Vol. 12 at 2087-2103 (TT 1473-89).
3. Additional Procedural Background
After the jury rendered its verdict, Mr. Durham filed a motion for new trial on various grounds. One ground was that the prosecution had "implied ... that [his] struggles with homosexuality make it more likely that [he] sexually assaulted and molested children." ROA, Vol. 3 at 321.
The district court denied the motion. In doing so, it did not separately address Mr. Durham's claim that the prosecution had improperly suggested he had a propensity to commit the charged conduct. Instead, within its discussion of the admissibility of Mr. Durham's statements about struggling with homosexuality, the court stated that "[t]he United States never argued that Defendant engaged in sexual activity with the children because he is homosexual, rather the prosecution noted in closing argument that when confronted, he proffered an excuse." Id. at 785.[32]
4. Legal Background
"We analyze whether a statement constitutes prosecutorial misconduct using a two-step process." Fleming , 667 F.3d at 1103. "First, we determine whether the prosecutor's statements were improper." Id. (quotations omitted). "Second, we determine whether the prosecutor's improper statements were harmless beyond a reasonable doubt." Id. (quotations omitted).
"The Government generally bears the burden of proving that an improper statement is harmless beyond a reasonable doubt." Id. But "when, as here, a defendant fails to object to a prosecutor's statement, reversal is warranted only when: (1) the prosecutor's statement is plainly improper and (2) the defendant demonstrates that the improper statement affected his or her substantial rights." Id.
5. Analysis
Mr. Durham contends that "[t]he Government committed prosecutorial misconduct by arguing Mr. Durham was more likely to commit the alleged crimes because he struggled with homosexuality and Mr. Durham was irreparably prejudiced." Aplt. Br. at 39. Because, as we explain below, Mr. Durham failed to preserve either of the alleged instances of prosecutorial misconduct for appellate review, we review for plain error only. See Toro-Pelaez , 107 F.3d at 828. We begin and end our analysis at the third step of the plain error test-whether the error affected Mr. Durham's substantial rights. We conclude that Mr. Durham has failed to satisfy the *1228 substantial rights step, and we therefore affirm the district court's denial of his motion for a new trial.
a. Preservation
Mr. Durham failed to preserve either of the alleged instances of prosecutorial misconduct for appellate review by contemporaneously objecting on prosecutorial misconduct grounds.[33] We address each alleged instance of prosecutorial misconduct separately.
i. Alleged misconduct during cross-examination of Mr. Durham
Although defense counsel contemporaneously objected to the prosecution's cross-examination of Mr. Durham about struggling with homosexuality, defense counsel objected on the ground that the questioning was repetitious-not on the ground of prosecutorial misconduct for making a propensity argument. See ROA, Vol. 12 at 1999 (TT 1385). The district court therefore "did not have notice that defense counsel believed the prosecutor's questioning of [Mr. Durham] to be an inappropriate attempt at [making a propensity argument] or to rise to the level of prosecutorial misconduct." United States v. Baldridge , 559 F.3d 1126, 1135 (10th Cir. 2009).[34]
ii. Alleged misconduct during closing argument
The record shows-and Mr. Durham concedes-that defense counsel did not contemporaneously object to the prosecution's references to his struggle with homosexuality in its closing argument. See ROA, Vol. 12 at 2087-2103 (TT 1473-89); Aplt. Br. at 34 ("Defendant ... did not contemporaneously object during closing argument.").
b. Plain error-substantial rights
Because Mr. Durham failed to preserve either of the alleged instances of prosecutorial misconduct for appellate review, we review for plain error only. We find no plain error because Mr. Durham has failed to show that the alleged misconduct affected his substantial rights. We address each alleged instance of prosecutorial misconduct separately.
i. Alleged misconduct during cross-examination of Mr. Durham
Even assuming error in the prosecutor's references to homosexuality during cross-examination of Mr. Durham, any error did not affect Mr. Durham's substantial rights. "To show that an error affected his substantial rights, Mr. [Durham] must establish a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." Uscanga-Mora , 562 F.3d at 1295 (quotations omitted).
As discussed above, defense counsel objected to the prosecutor's questioning on Mr. Durham's struggle with homosexuality on the ground of repetitiousness. The district *1229 court sustained defense counsel's objections. Moreover, the court's preliminary instructions to the jury at the trial's outset had included the following: "If an objection is sustained, ignore the question." ROA, Vol. 12 at 623 (TT 9). Additionally, the jury's acquittal of Mr. Durham on several counts, despite the prosecutor's questions, suggests that the jury's verdict was "based on reason, rather than emotion." United States v. Archuleta , 737 F.3d 1287, 1296 (10th Circuit 2013). Under these circumstances, Mr. Durham has not shown a reasonable probability that, but for the prosecutor's questions, the jury would have rendered a different verdict. See United States v. Lane , 883 F.2d 1484, 1498 (10th Cir. 1989) ("As a general rule, we presume that juries follow [limiting] instructions.").
ii. Alleged misconduct during closing argument
Even assuming error in the prosecutor's references to homosexuality during closing argument, the error did not affect Mr. Durham's substantial rights. Mr. Durham contends otherwise, citing United States v. Schene , 543 F.3d 627 (10th Cir. 2008). Aplt. Reply Br. at 14.[35] In Schene , this court said that a prosecutor's question about whether the defendant had visited "websites with homosexual themes" was "arguably improper." 543 F.3d at 641-42.
Mr. Durham's argument fails because it does not consider the prosecution's remarks "in the context of the entire trial." Fleming , 667 F.3d at 1103 (quotations omitted). Despite acknowledging the potentially prejudicial impact of the prosecutor's conduct, we held in Schene that, "even assuming, arguendo , that [the defendant] preserved this argument for appeal ... the district court did not abuse its discretion in failing to grant a mistrial based on the prosecutorial misconduct." 543 F.3d at 642. We reasoned that, "[g]iven the evidence against [the defendant], ... the alleged prosecutorial misconduct was not flagrant enough to influence the jury to convict on grounds other than the evidence presented." Id. (quotations omitted).
Even more so here under plain error review, when "it is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice," Fleming , 667 F.3d at 1103 (quotations omitted), relief is not warranted based on the prosecution's closing argument. As summarized above, the Government presented ample independent evidence to show that Mr. Durham committed the offenses on which the jury convicted. For example, the trial evidence supporting the jury's verdict included victim testimony and detailed written confessions by Mr. Durham. ROA, Vol. 9 at 8, 15, 16; ROA, Vol. 12 at 658, 1406, 1440, 1458. And again, the jury's acquittal of Mr. Durham on the remaining counts further supports the harmlessness of any improper prosecutorial argument. See Archuleta , 737 F.3d at 1296. So even if we could read the prosecutor's closing argument as improperly suggesting that Mr. Durham's struggle with homosexuality made him more likely to act on his temptation to touch children, Mr. Durham is not entitled to relief on plain error review.
* * * *
Mr. Durham has not shown that the alleged improper prosecutorial statements, individually or taken together, affected his substantial rights under the plain error *1230 test. We therefore affirm the district court's denial of Mr. Durham's motion for a new trial on grounds of prosecutorial misconduct.
E. Issue Five: Cellphone Videos Authentication
Mr. Durham challenges the admission of Ms. Menja's cellphone-recorded videos of his confession as improperly authenticated. Aplt. Br. at 42. He argues the "Government did not sufficiently address [his] contention that the recordings had been altered." Aplt. Br. at 45. He contends the videos were admitted in error due to Mr. Durham's "specific showing of irregularities" and inability to inspect the cellphone itself. [Id. at 46.] Because Ms. Menja's testimony laid a sufficient foundation for authentication, we find that the district court did not abuse its discretion when it admitted her cellphone videos and affirm.
1. Standard of Review
Whether the Government laid a sufficient foundation for the videos to be admitted at trial is reviewed for abuse of discretion. United States v. Green , 175 F.3d 822, 829 (10th Cir. 1999). Abuse of discretion is defined as "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." United States v. Cardenas , 864 F.2d 1528, 1530 (10th Cir. 1989).
2. Additional Background
On June 17, 2014, Ms. Menja recorded part of her conversation with Mr. Durham at the Seagull restaurant on her cellphone. The Government's trial exhibits included the five Seagull Confession Videos recorded by Ms. Menja that day. See Gov't Exs. 3-7. Each was admitted and played for the jury.[36] Videos played in ROA, Vol. 12, 858-870 (TT 244-56). Ms. Menja initially turned over her cellphone to the Government so that investigators could copy the data. ROA, Vol. 12 at 433. The Government made copies and returned the phone to her. Id.
a. Pre-Trial
Before trial, Mr. Durham moved in limine to inspect the cellphone used to record his statements and to have an expedited chain of custody hearing. ROA, Vol. 1 at 631. The court held a hearing on the motion. ROA, Vol. 12 at 427. At the hearing, the Government explained that it would be providing Mr. Durham a "mirror image" of Ms. Menja's phone, but not the cellphone itself. ROA, Vol. 12 at 433; ROA, Vol. 2 at 543. The Government described the mirror image as follows:
When you make a video with a phone, unbeknownst to the person who is filming, images are embedded into the phone called LBLs. If you go back to that video and you cut off a portion of the recording, a forensic examiner would show that those LBLs still exist. More or less, it's like a fingerprint. In this case, the only way to get to that is to look at the actual phone. So based upon the defendant's concerns, we asked to receive the phone and we made a mirror image. That way, we can return the phone and do a forensic review on the computer, it would be just like we had her phone.
ROA, Vol. 12 at 427-28.
The Government explained that the mirror image would allow defense counsel to *1231 analyze whether the videos had been altered: "[a forensic examiner] would be able to look at the LBLs to make sure there's no outstanding LBL missing video." Id. at 429. Defense counsel responded that the mirror image would not be sufficient to inspect for alterations. Id. at 430.
The court ordered the Government to turn over the mirror image to defense counsel. It denied without prejudice Mr. Durham's "Motion to Compel Production, Inspection and Imaging of Cell Phone and Expedite Chain of Custody Hearing," allowing Mr. Durham to renew the motion if necessary following his counsel's inspection of the mirror image. ROA, Vol. 12 at 435; ROA, Vol. 2 at 40.
After his forensic expert, Donovan Farrow, analyzed the mirror image, Mr. Durham filed a "Renewed Motion to Compel Production, Inspection, and Imaging of Cell Phone." ROA, Vol. 2 at 533.[37] In support of the motion, Mr. Farrow submitted an affidavit arguing that the mirror image "cannot be considered a true representation of the evidence at the time the videos were recorded" and that "[i]t appears the Government is attempting to piecemeal the cell phone evidence and only provide Defense Counsel with limited information regarding the videos." Id. at 543. More specifically, he opined:
[A] type of data scrubbing had occurred on some of the video files. Data scrubbing is a technique used to erase metadata that is related to a file. This technique has to be done by a person with knowledge and is not something that can occur unintentionally. Thus, this evidence has been compromised as it was intentionally tampered with to the point the video's metadata was deleted.
Id. at 544.
Before the hearing on the renewed motion to compel, the court arranged for a meeting between the parties' forensic experts. ROA, Vol. 12 at 592-596. At that meeting, Mr. Farrow requested a "logical image" from the Government, which he later received and analyzed. ROA, Vol. 12 at 595.[38]
At the pretrial hearing on the renewed motion to compel, Mr. Durham's counsel argued, "[W]e stated last time we were here in court that the metadata had been scrubbed.... After looking at the logical image, which is just a portion of the cell phone, [Mr. Farrow] found that the videos had, in fact, been split up. They had been cut. He can tell that from the file names." ROA, Vol. 12 at 595. The court concluded Mr. Durham could call Mr. Farrow as a witness to testify that the videos had been altered, but it declined to exclude the videos entirely. ROA, Vol. 12 at 596. The court also noted that the Government "will have to lay the proper foundation for the introduction of these videos, and, obviously, cross-examination could be fruitful." ROA, Vol. 12 at 596.
b. Trial
At trial, the court overruled Mr. Durham's contemporaneous objection to admission of the Seagull Confession Videos. ROA, Vol. 12 at 857 (TT 243). The Government first showed one of the videos during its direct examination of Ms. Menja, who had recorded the video on her cellphone. Before showing the video, the Government asked Ms. Menja if she had reviewed the cellphone videos on both her phone and on *1232 a computer. She responded that she had and that the videos were "identical." ROA, Vol. 12 at 856-57 (TT 242-43). The Government then moved to admit the cellphone videos. Id. at 857 (TT 243). Before the court ruled, it asked Ms. Menja whether the videos "accurately reflect[ed] [her] memory of what occurred on that date." Id. at 857 (TT 243). She said that they did, and the court admitted the videos. Id.
During the direct examination of Ms. Menja, the Government asked her several times whether she manipulated, changed, or edited the footage in any way. ROA, Vol. 12 at 859, 861, 865 (TT 245, 247, 251). Each time, she responded that she had not. Id. The defense neither cross-examined Ms. Menja about alteration of the videos nor called Mr. Farrow or any other forensic expert to testify about the Seagull videos.[39] ROA, Vol. 12, at 893-961 (TT 279-347).
3. Legal Background
To authenticate evidence for admission at trial, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).
"When evidence is unique, readily identifiable and relatively resistant to change, the foundation need only consist of testimony that the evidence is what its proponent claims." United States v. Johnson , 977 F.2d 1360, 1367 (10th Cir. 1992) (quotations omitted); see also United States v. McIntyre , 836 F.2d 467, 470 (10th Cir. 1987) (audiotape of statement admissible in trial where witness who heard statement also testifies and gives independent support for testimony).
On the other hand, when evidence "is not readily identifiable and is susceptible to alteration by tampering or contamination, the trial court requires a more stringent foundation entailing a chain of custody of the item with sufficient completeness to render it improbable that the original item has either been exchanged with another or been contaminated or tampered with." Johnson , 977 F.2d at 1367 (quotations omitted). A videotape that has been altered in some form may still be "readily identifiable" and "not susceptible to alteration by tampering" for purposes of authentication. See, e.g., United States v. Mills , 194 F.3d 1108, 1112 (10th Cir. 1999) (allowing videotape into evidence, finding it "readily identifiable" and "sufficient[ly] complete[ ] to render it improbable [that it had] ... been contaminated or tampered with," despite a deletion that did "not affect the accuracy of the remaining images"). The trial court "need not rule out every possibility that the evidence underwent alteration; it need only find that the reasonable probability is that the evidence has not been altered in any material aspect." Cardenas , 864 F.2d at 1532.
4. Analysis
The district court did not abuse its discretion in determining there was a sufficient foundation supporting the cellphone videos' authenticity. Ms. Menja testified that she had reviewed the videos and that they were a fair and accurate depiction of what she saw. ROA, Vol. 12 at 857 (TT 243). That testimony gave the court sufficient basis to determine the videos were authentic. See Mills , 194 F.3d at 1112 (finding no abuse of discretion for a video's admission when the person responsible for creating the video confirmed that it accurately depicted what it claimed to depict); see also *1233 United States v. Cejas , 761 F.3d 717, 723 (7th Cir. 2014) (finding no error in admitting video that the witness testified was a "fair and accurate depiction" of what he saw). Further supporting the video's authenticity was Ms. Menja's testimony that she had not edited or altered the videos in any way. ROA, Vol. 12 at 859, 861, 865 (TT 245, 247, 251).[40]
To the extent Mr. Durham believed the videos did not depict what they claimed to depict, the court gave him an opportunity to cross-examine Ms. Menja on alterations to the videos and to call his forensic expert to testify on them. He chose to do neither. See Johnson , 977 F.2d at 1368 (defense counsel's failure to cross on an authentication issue cuts against an argument to exclude evidence). The district court did not abuse its discretion when it admitted the cellphone videos as sufficiently authenticated.
F. Issue Six: Victims' Medical Records
Mr. Durham challenges the district court's admission of the full set of the victims' medical records, rather than just a portion of those records, on four grounds: (1) the court admitted all of the records when he had requested admission of only part of them (the "P-3" records), Aplt. Br. at 47; (2) the additional admitted material lacked authentication, Aplt. Br. at 47; (3) the full records included inadmissible "double hearsay," Aplt. Br. at 47-48;[41] and (4) admitting the full records was unduly prejudicial. As to the last point, Mr. Durham alleges the records contained graphic representations that "inflamed the Jury's sympathies for the alleged victims" and contained an entry that one child "was defiled by a man named Matthew." Aplt. Br. at 47-48. Because Mr. Durham invited any error, and because he cannot show error, his argument fails under plain error review. We affirm the district court's admission of the full medical records.
1. Standard of Review
Mr. Durham failed to object to admission of the records at trial, so the plain-error standard applies. He must accordingly show: "(1) error, (2) that is plain, which (3) affects the defendant's substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Baldridge , 559 F.3d 1126, 1135 (10th Cir. 2009). Mr. Durham's challenge fails at the first element-whether the district court erred. We review evidentiary rulings for error under an abuse of discretion standard. Willis , 826 F.3d at 1270.
2. Additional Background
The medical records that the Government provided to Mr. Durham consisted of: (1) a Post Rape Care ("PRC") form; (2) lab requests; (3) clinician notes; and (4) a *1234 Medical Examination Report, also known as a P-3 form. ROA, Vol. 10a at 28-80. The clinician on call filled out the PRC form for the six children examined. ROA, Vol. 12 at 1182 (TT 568). A supervising physician, Dr. Abdulkadir, then reviewed the PRC forms and prepared P-3 forms based on that review. ROA, Vol. 12 at 1182-85 (TT 568-71).
During cross-examination of Dr. Abdulkadir, defense counsel moved for admission of a P-3 Form only. See ROA, Vol. 12 at 1202 (moving to admit pages "1 through 4" of Government's Exhibit 44); ROA, Vol. 10a at 28 (P-3 form). The Government responded by moving to enter the entire exhibit, which included all four components described above. ROA, Vol. 12 at 1202 (TT 588). Defense counsel then stated: "I would ask that they move to[sic] Exhibits-enter Exhibit 45, 46, 47, 48, and 49 as well." ROA, Vol. 12 at 1202 (TT 588). The Court admitted all of the records. Id. Defense counsel did not object. Id .
3. Legal Background
a. Invited error
It is "fundamental that a defendant cannot complain of error which he invited upon himself." United States v. Chavez , 229 F.3d 946, 952 (10th Cir. 2000) (quotations omitted).
b. Authentication
To authenticate evidence for admission at trial, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).
c. The hearsay rule and pertinent exceptions
"Hearsay" is a statement that "the declarant does not make while testifying at the current trial or hearing" and "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). It is inadmissible unless an exception applies. Fed. R. Evid. 802. One such exception is for business records-"records of a regularly conducted activity." Fed. R. Evid. 803(6). "[H]ospital records ... fit conceptually within the long-established exception for business records." Manocchio v. Moran , 919 F.2d 770, 776 (1st Cir. 1990).
Another exception to the hearsay rule is for a "statement that: (A) is made for-and is reasonably pertinent to-medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803(4). This court has recognized that "the Fourth, Eighth and Ninth Circuits have held that statements made by a child to a physician which identify the sexual abuser as a member of the family or household are 'reasonably pertinent to diagnosis or treatment' and may therefore be admissible [under Rule 803(4) ]." United States v. Joe , 8 F.3d 1488, 1494 (10th Cir. 1993). Accepting these holdings as valid, we extended their application to cover abuser identifications during medical examinations made by adult domestic sexual assault victims. Id. at 1495.
d. Unfair prejudice
Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of ... unfair prejudice." Fed. R. Evid. 403. The graphic nature of evidence does not alone make it inadmissible. See United States v. Naranjo , 710 F.2d 1465, 1468-69 (10th Cir. 1983) (allowing photograph of victim shot in the face because it showed the "particulars of the crime scene" and "was not unduly nor designedly inflammatory").
*1235 4. Analysis
Mr. Durham's challenge to the court's admission of the victims' full medical records fails. Any error was invited, and he cannot show error on any ground he raises on appeal. It follows that he cannot show plain error. Baldridge , 559 F.3d at 1135.
At trial, following Mr. Durham's request to admit a P-3 Form, which was part of the medical records in Government Exhibit 44, the Government requested the admission of the entire medical record-including the PRC form, lab requests, clinician notes, and the Medical Examination Report. ROA, Vol. 12 at 1202 (TT 588). Rather than object, Mr. Durham's counsel requested to move "Exhibit[s] 45, 46, 47, 48, and 49" into evidence "as well." ROA, Vol. 12 at 1202 (TT 588). Those exhibits included entire medical records, not just P-3 forms. Mr. Durham thus invited any potential error from admitting the records and cannot establish a plain error warranting reversal. See Chavez , 229 F.3d at 952 (finding no plain error when the appellant invited the complained-of error). Although invited error alone is sufficient to reject Mr. Durham's challenge on appeal to admission of this evidence, we also determine there was no error based on any of the four grounds Mr. Durham argues.
First, Mr. Durham argues his initial request to admit only the P-3 form showed "counsel's intent was to admit only a limited portion of the medical records." Aplt. Reply Br. at 17. Even if that were so, counsel switched gears and requested admission of the entire records.
Second, Mr. Durham's authenticity argument fails in light of Dr. Abdulkadir's testimony. See ROA, Vol. 12 at 1179-83 (TT 565-69). She testified that she supervised the department where the records were created, reviewed the PRCs when they were filled out to make sure they had been properly completed, and reviewed the records before testifying. Id.
Third, there was no hearsay error. Mr. Durham makes no argument about admission of the medical records themselves under the business record or some other exception to the hearsay rule. The only specific reference in the medical records Mr. Durham challenges based on hearsay is one victim's identification of "Matthew" during her examination. That statement, identifying a member of the child's household as the abuser, was admissible under Joe, 8 F.3d at 1494-95.[42]
Fourth, the court did not abuse its discretion under Fed. R. Evid. 403. Mr. Durham does not question the probativeness of the medical records. Mr. Durham characterizes the records as including "graphic representations about where the child was touched and the purported genital injury," Aplt. Br. at 47. We have reviewed the evidence and conclude the district court's balancing of the probative value and prejudicial effect was reasonable. See Naranjo , 710 F.2d at 1468-69 (graphic image admissible if highly probative and not designedly inflammatory). The records were highly probative of the victims' injuries. The evidence was collected as part of a standardized medical examination process and was not "designedly inflammatory." Id. at 1469.
Because Mr. Durham invited error and has not otherwise shown the court erred, *1236 we affirm the records' admission and reject Mr. Durham's appeal.[43]
G. Issue Seven: Substantive Reasonableness of Sentence
Mr. Durham challenges his 480-month sentence as substantively unreasonable. Aplt. Br. at 58-59. He "does not challenge the district court's procedure in calculating" the recommended sentence under the Guidelines. Aplt. Reply Br. at 26. We affirm his sentence because he has not shown that the district court abused its discretion in weighing the sentencing factors set forth in 18 U.S.C. § 3553(a).
1. Standard of Review
We "review the substantive reasonableness of a sentence for abuse of discretion." United States v. Chavez , 723 F.3d 1226, 1233 (10th Cir. 2013) ; see also Gall v. United States , 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) ("[T]he appellate court should ... consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.").
We find no abuse unless the sentence "is arbitrary, capricious, whimsical, or manifestly unreasonable." United States v. Munoz-Nava , 524 F.3d 1137, 1146 (10th Cir. 2008) (quotations omitted). "That is to say, we recognize that in many cases there will be a range of possible outcomes the facts and law at issue can fairly support; rather than pick and choose among them ourselves, we will defer to the district court's judgment so long as it falls within the realm of ... rationally available choices." United States v. McComb , 519 F.3d 1049, 1053 (10th Cir. 2007).
2. Additional Factual Background
The final PSR calculated a Guidelines sentence of 1,440 months in prison based on Mr. Durham's total offense level and criminal history category. ROA, Vol. 7 at 142.[44] The PSR identified only one factor potentially warranting a downward departure-that Mr. Durham was 19 years old when he committed the offenses of conviction. Id. at 145-46. The district court adopted the PSR's calculated Guidelines sentence of 1,440 months. Id. at 475.[45]
*1237 The court sentenced Mr. Durham to 480 months in prison, a sentence it characterized as a downward variance. ROA, Vol. 3 at 844; ROA, Vol. 7 at 477; ROA, Vol. 13 at 158.[46] The court offered the following explanation of its decision at Mr. Durham's sentencing hearing:
The sentence the Court has selected, I'm satisfied, is sufficient but not greater than necessary, when considering the sentencing factors set forth in 18 U.S. Code 3553.
18 U.S. Code 3553 requires the Court to consider these factors:
The nature and circumstance of the offense; and the history and characteristics of the defendant.
In this regard, pursuant to reading the sentencing memorandum and what I've heard here today, I have considered the age of the defendant, the fact he is a first-time offender, his potential for the future, his charitable efforts prior to this occasion, that this at least appears to be aberrant behavior, the defendant has asked for mercy from the Court[,] ... his success in school, and all the other matters raised in the defendant's brief.
The next factor the Court must consider are [sic] the need for the sentence imposed. This includes to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.
The kind of sentence available is number three.
Finally, the kind of sentences and the sentencing range, which has been established. And the sentencing guidelines call for a sentence of life in prison.
Next, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.... I read all the cases cited by both the defendant and the government. And, actually, I didn't find these particularly helpful. They went all over the lot, and circumstances differed from one case to another. There obviously wasn't one that fit exactly with this case, and you wouldn't expect there to be.
The only time I have had a case of rape ... I had one sentence five or six years ago ... in which the defendant was convicted of raping his 11-year-old niece. He had a prior conviction for sexual molestation, and I imposed a sentence of 50 years' incarceration.
Finally is the need to provide restitution to any victims of the offense.
These were heinous crimes committed on the most vulnerable victims. These darling children, who had been abandoned and orphaned, looked to the defendant for love and support. Instead, one by one they were raped. One was but five years old.
At times he chose to humiliate the children by having one watch while he abused or raped another. He was their worst nightmare come true.
Of course, there are other victims, including the children the defendant molested, but the counts were dismissed *1238 because the acts didn't technically fit the charge.
And the Upendo home and the people that worked and volunteered there, they were trying to help the forsaken. This is now how they are known or what they must deal with.
These violent acts demand a harsh sentence. The victims must feel secure that he will not touch them again. However, I also believe, when considering everything, there should be some light at the end of the tunnel.
Hopefully, with appropriate treatment and strict supervision after release, the defendant can live productively and safely in society.
ROA, Vol. 13 at 156-58.
3. Legal Background
A substantive reasonableness sentencing challenge asks us to address "whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." United States v. Verdin-Garcia , 516 F.3d 884, 895 (10th Cir. 2008) (quotations omitted); see Gall , 552 U.S. at 51, 128 S.Ct. 586.[47]
When a defendant is sentenced within a properly calculated Guidelines range, the sentence "is entitled to a rebuttable presumption of reasonableness." United States v. Kristl , 437 F.3d 1050, 1054 (10th Cir. 2006) (per curiam). In addition, we have endorsed "the logical and unremarkable proposition that 'a below-guideline sentence is also presumptively reasonable against an attack by a defendant claiming that the sentence is too high.' " United States v. Balbin-Mesa , 643 F.3d 783, 788 (10th Cir. 2011) (quoting United States v. Liddell , 543 F.3d 877, 885 (7th Cir. 2008) ).
4. Analysis
Mr. Durham challenges his 480-month sentence as substantively unreasonable. Aplt. Br. at 58-59. Because Mr. Durham "does not challenge the district court's procedure in calculating" the Guidelines sentence, Aplt. Reply Br. at 26, which was determined to be 1,440 months, we presume that his sentence is substantively reasonable.[48] We affirm because Mr. Durham's arguments fail to overcome the presumption that his sentence is substantively reasonable in light of the § 3553(a) factors.
*1239 First, Mr. Durham appears to argue that he should have been sentenced to no more than 470 months in prison, citing an online publication by the United States Sentencing Commission (the "Commission") for the proposition that "a life sentence is the equivalent of 470 months." Aplt. Br. at 58. This argument implicates procedural reasonableness rather than substantive reasonableness because it relates to the district court's calculation of the Guidelines range rather than its weighing of the § 3553(a) factors. See Gall , 552 U.S. at 51, 128 S.Ct. 586 ("failing to calculate (or improperly calculating) the Guidelines range" is a procedural error). "To the extent [Mr. Durham] seeks to challenge the procedural reasonableness of the district court's sentencing calculation, ... any such arguments have been waived by [his] failure either to raise th[is] specific objection[ ] below or to make an argument for plain error review on appeal." United States v. DeRusse , 859 F.3d 1232, 1236 n.1 (10th Cir. 2017).[49]
Second, Mr. Durham contends that his sentence is unreasonably high in light of the need to avoid unwarranted disparities. See Aplt. Br. at 58-59. This argument also lacks merit. At Mr. Durham's sentencing hearing, the district court stated that it had "read all the cases cited by both the defendant and the government [pertaining to the disparities factor]" but "didn't find [them] particularly helpful" because "circumstances differed from one case to another." ROA, Vol. 13 at 157. On appeal, Mr. Durham has not challenged the court's determination that the other cases he presented involved dissimilarly situated offenders. See United States v. Franklin , 785 F.3d 1365, 1372 (10th Cir. 2015) ("No two cases are identical, and comparison of an individual sentence with a few counsel-selected cases involving other defendants sentenced by other judges is almost always useless." (citation and quotations omitted) ). Nor has he advanced any reason to question the court's weighing of the disparities factor. See United States v. Barnes , 890 F.3d 910, 921 (10th Cir. 2018) ("Even if the disparities factor weighs in favor of a higher sentence, the district court considered it alongside other factors and the facts of this case and did not abuse its discretion in imposing the sentence[ ] it did.").
* * * *
Mr. Durham has failed to rebut the presumption that the district court reasonably weighed the § 3553(a) factors or to show that its sentencing decision exceeds the bounds of permissible choice. We therefore affirm Mr. Durham's 480-month sentence.
H. Issue Eight: Cumulative Error
Finally, Mr. Durham argues that the errors he alleges, taken together, deprived him of a fair trial. Aplt. Br. at 59-60. "To analyze cumulative error, we aggregate all the errors that we have found to be harmless and determine whether their cumulative effect on the outcome of the trial mandates reversal." United States v. Anaya , 727 F.3d 1043, 1060-61 (10th Cir. 2013) (quotations omitted). In conducting our cumulative error analysis, we consider two of Mr. Durham's claims: (1) the *1240 Brady claim,[50] and (2) the prosecutorial misconduct claim.[51]
"When there are both preserved and unpreserved errors, cumulative-error analysis should proceed as follows: First, the preserved errors should be considered as a group under harmless-error review. If, cumulatively, they are not harmless, reversal is required." Id. at 1061 (alterations and quotations omitted). "The only potential preserved error is the [alleged Brady error]. Without other errors to aggregate, there can be no cumulative harm." Id. We therefore proceed to the next step of our cumulative error analysis.
"If the preserved errors are cumulatively harmless, then the court should consider whether those preserved errors, when considered in conjunction with the unpreserved errors, are sufficient to overcome the hurdles necessary to establish plain error." Id. (quotations omitted). "That is, we look to whether the combination of the [alleged Brady error] and the prosecutor's statements regarding [Mr. Durham's struggle with homosexuality] affected Mr. [Durham]'s substantial rights or seriously affected the fairness, integrity, or public reputation of judicial proceedings." Id. (alterations and quotations omitted).
Mr. Durham cannot show that the combination of the alleged Brady and prosecutorial misconduct errors affected his substantial rights. As discussed above, he suffered minimal (if any) prejudice from the alleged Brady error because defense counsel-through Nurse Dunson-presented an effective rebuttal to Dr. Abdulkadir's testimony based on information that was substantially the same as the withheld evidence. Moreover, the evidence of Mr. Durham's guilt was strong. For example, the trial evidence supporting the jury's verdict included victim testimony and detailed written confessions by Mr. Durham. ROA, Vol. 9 at 8, 15, 16; ROA, Vol. 12 at 658, 1406, 1440, 1458. "Consequently, even if we aggregate the[ ] alleged [ Brady and prosecutorial misconduct] errors, there is no cumulative error." Anaya , 727 F.3d at 1061.
III. CONCLUSION
We affirm Mr. Durham's convictions and sentence.

"ROA" denotes "Record on Appeal." "TT" denotes "Trial Transcript."

The trial transcript spells Ms. Wambugu's first name as "Josphine," but court records refer to her as "Josephine." See ROA, Vol. 1 at 40. We therefore assume her name is properly spelled "Josephine."

Mr. Durham brings both a facial and an as-applied challenge. See Aplt. Br. at 48. The Government contends he has waived his as-applied challenge, but even if this is so, we may resolve a facial challenge by conducting an as-applied analysis.
We previously have said that "we need not and do not address [a] facial challenge" when "we conclude the as-applied challenge fails." United States v.Morgan , 748 F.3d 1024, 1031 (10th Cir. 2014). For a statute to be facially unconstitutional, Mr. Durham "must establish that [the] law is unconstitutional in all of its applications." City of Los Angeles v. Patel , --- U.S. ----, 135 S.Ct. 2443, 2451, 192 L.Ed.2d 435 (2015) (quotations omitted); cf. United States v. Stevens , 559 U.S. 460, 473, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) ("In the First Amendment context ... this Court recognizes a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional...." (quotations omitted) ).
We therefore address Mr. Durham's facial challenge through an as-applied analysis. Under § 2423(c), Mr. Durham was convicted of engaging in illicit sexual conduct abroad after traveling in foreign commerce, the paradigmatic conduct targeted under the provision. See, e.g. , United States v. Bollinger , 798 F.3d 201, 203-04 (4th Cir. 2015), cert. denied , --- U.S. ----, 136 S.Ct. 2448, 195 L.Ed.2d 263 (2016) ; United States v. Pendleton , 658 F.3d 299, 301-02 (3d Cir. 2011). Because we conclude that § 2423(c) is constitutional as applied to Mr. Durham, he cannot succeed on either a facial or as-applied challenge.

Chapter 117 also includes sections on sentencing individuals for such offenses, definitions of illicit sexual activity, and forfeiture options once an individual is convicted. See 18 U.S.C § 2426 (sentencing for repeat offenders); id. § 2427 (definition of "sexual activity for which any person can be charged with a criminal offense" to include production of child pornography); id. § 2428 (forfeiture of property that was used in the commission of crimes or derived from the proceeds of crimes).

For a noncommercial sex act, the conduct would also have to "be in violation of Chapter 109A," which contains various sexual abuse offenses. See 18 U.S.C. §§ 2241 -2248.

In the original 1994 version, § 2423(b) criminalized "any sexual act ... with a person under 18 years of age." See 18 U.S.C. § 2423(b) (1994). The Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act") replaced this phrase with "any illicit sexual conduct with another person" and added the definition section in § 2423(f), which includes a definition of "illicit sexual conduct" as "a sexual act with a person under 18 years of age." Pub. L. No. 108-21, § 105, 117 Stat. 650, 654 (2003).

The 1907 Act also prohibited anyone from "keep[ing], maintain[ing], control[ling], support[ing], or harbor[ing] in any house or other place" women for the purpose of prostitution. § 3, 34 Stat. at 899.

The Mann Act has been recodified and amended as 18 U.S.C. §§ 2421 -2424. Section 2 of the Mann Act parallels 18 U.S.C. § 2423(a), which criminalizes knowingly transporting individuals for the purposes of prostitution or illicit sexual activity. Compare § 2, 36 Stat. at 825 (codified at 18 U.S.C. § 398 (1940) ) ("[K]nowingly transport[ing] ... in interstate or foreign commerce ... any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose...."), with 18 U.S.C. § 2423(a) ("[K]nowingly transport[ing] an individual who has not attained the age of 18 years in interstate or foreign commerce ... with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense...."). Section 2423 also contains other provisions to address international sex tourism. See 18 U.S.C. §§ 2423(b) -(f).

STPIA's version of the provision read:
(c) Engaging in Illicit Sexual Conduct in Foreign Places. Any United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 15 years, or both.
H.R. 4477, § 2, 107th Cong. (2002).

Congressional discussion of STPIA also emphasized the size of the international sex trafficking market. Representative Lamar Smith commented that "[t]his world sex market is a multi-billion dollar industry that denies children their rights, their dignity, and their childhood." 148 Cong. Rec. 11,222 (2002).

Section 2423(c)'s more recent legislative history bolsters this understanding. In 2013, Congress passed the, Violence Against Women Reauthorization Act ("VAWRA"), Pub. L. No. 113-4, 127 Stat. 54 (2013). The Act added the "residing clause" to § 2423(c) : individuals who "reside[ ], either temporarily or permanently in a foreign country" and engage in illicit sexual conduct may also be prosecuted. Id. § 1211, 127 Stat. at 142 (codified at 18 U.S.C. § 2423(c) ). Senator Patrick Leahy introduced the "residing clause" to VAWRA through his amendment. See S. Amend. 21, 113th Cong. (2013) (amending S. 47, 113th Cong. (2013) (enacted) ); 159 Cong. Rec. 1137 (2013) (statement of Sen. Leahy). He emphasized the amendment targeted the global sex trafficking market: "We know that young women and girls often just 11, 12, or 13 years old are being bought and sold," and that "millions around the world are counting on us." Id. at 1138.

Although the Court has discouraged the aggregation of noneconomic activity, it has not prohibited it. In Morrison , the Court did not "adopt a categorical rule against aggregating the effects of any noneconomic activity." 529 U.S. at 613, 120 S.Ct. 1740.

As with the ICC, the Court has recognized that, in addition to delegating express power to regulate foreign commerce, the FCC implicitly restricts the states from regulating foreign commerce. See Japan Line , 441 U.S. at 449, 99 S.Ct. 1813 (discussing the "negative implications" of Congress's power under the FCC).

The dissent counters that the "difference in prepositions indicates the opposite." Dissent Op. at 1250. It posits that "[i]f the [FCC] permitted regulation of commerce 'among foreign nations' ... then Congress would be empowered to regulate commerce among France, England, and Italy," suggesting that "among" is broader than "with." Id . But the relevant comparison is not between the FCC's use of "with" and a hypothetical FCC's use of "among." Rather, it is between the FCC's use of "with" and the ICC's use of "among." Looking at these words in context supports our interpretation. In Gibbons , after discussing how "among" prevented Congress from regulating "those [internal concerns] which are completely within a particular State," the Court stated that the phrase "with foreign nations" means "the power of Congress does not stop at the jurisdictional lines of the several States." Gibbons , 22 U.S. at 195. Because "with foreign nations" allows for federal regulation of activity within states without limitation, the Court in Gibbons suggests the phrase confers broader authority. Moreover, the use of "with" in the Indian Commerce Clause suggests broader authority, granting "plenary power" in regulating commerce with Indian tribes. See Lara , 541 U.S. at 200, 124 S.Ct. 1628 (quotations omitted).

The dissent starts with a line in Gibbons : "[Commerce] carr[ies] the same meaning throughout the [Commerce Clause] ... unless there be some plain intelligible cause which alters it." Dissent Op. at 1242 (quoting Gibbons , 22 U.S. at 194 ). The dissent also "infer[s] that the same proposition applies to the word regulate in the Clause." Id .
It assumes the Indian Commerce, Foreign Commerce, and Interstate Commerce Clauses convey the same power absent a "plain, intelligible cause." But even though "commerce" and "regulate" may "carry the same meaning" throughout the Commerce Clause, each modifier-Indian, Foreign, and Interstate-and its accompanying preposition-"among" and "with"-describe a different context. See Atlantic Cleaners & Dyers , 286 U.S. at 434, 52 S.Ct. 607 (Although "the power to regulate commerce is conferred by the same words of the commerce clause with respect both to foreign commerce and interstate commerce ... the power when exercised in respect of foreign commerce may be broader than when exercised as to interstate commerce."). As the dissent acknowledges, for example, the Indian Commerce Clause grants Congress a broader power than the ICC, despite the meaning of commerce and regulate remaining the same in both provisions. See Dissent Op. at 1242-43 (quoting Lara , 541 U.S. at 200, 124 S.Ct. 1628 ).

These limits are reflected in the doctrinal framework we draw from the third Lopez category and adapt for the foreign commerce context. See infra Part II.A.4.

To support its foreign state sovereignty theory, the dissent quotes The Schooner Exchange v. McFaddon , 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), and Alexander Hamilton's The Defence , Dissent Op. at 1251-52 (quoting Schooner Exch., 11 U.S. at 136 and Alexander Hamilton, The Defence No. XXXVI (Jan. 2, 1796), in 20 The Papers of Alexander Hamilton (Harold C. Syrett ed. 1974) ), but their relevance to congressional authority under the FCC is unclear.
First, The Schooner Exchange established that foreign sovereigns and their instruments may not be hailed into American courts, which hardly speaks to congressional authority to regulate foreign commerce under the FCC. See Verlinden B.V. v. Central Bank of Nigeria , 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (describing foreign sovereign immunity as a matter of comity and grace and not a constitutional restriction). Second, the dissent's Hamilton quote comes from his thirty-sixth essay in 1796 advocating for adoption of the proposed Jay Treaty with Great Britain and explaining why the treaty was constitutional. The essay mentions the FCC in its discussion distinguishing treaties and laws. But it sheds little light on our issue here, other than perhaps Hamilton's comment that the power to make laws for the nation under the FCC reaches its citizens abroad. See The Defence No. XXXVI (Jan. 2, 1796), in 20 The Papers of Alexander Hamilton (Harold C. Syrett ed. 1974) (the power to make laws "acts ... upon its own citizens ... without its territory in certain cases and under certain limitations. But it can have no obligatory action whatsoever upon a foreign nation or any person or thing within the jurisdiction of such foreign Nation." (emphasis added) ). Mr. Durham was charged when he returned to the jurisdiction of the United States.

Because we determine that § 2423(c) is constitutional under the third category, we need not analyze it under the first and second. We note that § 2423(c) does not regulate the instrumentalities of foreign commerce and that the Third Circuit has upheld the constitutionality of § 2423(c) as a valid regulation of the channels of foreign commerce. See Pendleton, 658 F.3d at 311.

The dissent also suggests that there must be congressional findings demonstrating that a larger "regulatory scheme could be undercut unless the intrastate activity were regulated ." Dissent Op. at 1260 (quoting Lopez , 514 U.S. at 561, 115 S.Ct. 1624 ). Because, the dissent contends, Congress made no findings that the "failure to control noncommercial illicit sexual conduct would 'undercut' [the regulation of commercial sex]," id . at 1260-61, § 2423(c) was not an essential part of the broader regulation. We disagree.
First, as already stated, "the absence of particularized findings does not call into question Congress'[s] authority to legislate." Raich , 545 U.S. at 21, 125 S.Ct. 2195. The Court has never required legislative findings, let alone findings showing that a regulatory scheme would be undercut without regulation of a particular activity.
Second, the legislative history demonstrates that § 2423(c) was an essential part of the broader regulatory scheme. The intent requirement in § 2423(b) was undercutting sex tourism prosecutions. By shedding the mens rea requirement, Congress enabled the prosecution of individuals who travel abroad and have illicit sex-whether commercial or noncommercial-with minors. Congress could rationally believe that without § 2423(c), these same individuals would continue to fuel the international sex tourism market.

We have recently interpreted Raich as supporting congressional "regulation of noncommercial, purely intrastate activity that is an essential part of a broader regulatory scheme that, as a whole, substantially affects interstate commerce (i.e., has a substantial relation to interstate commerce)." PETPO , 852 F.3d at 1002. In PETPO , we upheld the provisions of the Endangered Species Act ("ESA") that allow the U.S. Fish and Wildlife Service ("FWS") to promulgate regulations protecting threatened or endangered species. Id. at 994. Under these provisions, the FWS prohibited the "take"-or the harassment, harm, pursuit, hunting, shooting, wounding, killing, trapping, capturing, or collecting-of Utah prairie dogs, a purely intrastate species, on nonfederal lands. Id . PETPO, an organization of property owners affected by the regulation, argued that Congress exceeded its authority under the ICC in authorizing the FWS to promulgate regulations prohibiting the "take" of prairie dogs-a noncommercial activity. Id . at 996.
We upheld the provisions because, under Raich , they were "an essential part of the ESA's broader regulatory scheme which, in the aggregate, substantially affects interstate commerce." Id . at 1002. Even though the regulation protecting prairie dogs concerned noncommercial activity, we recognized that Congress had a rational basis to conclude that the regulated activity had a substantial relationship to interstate commerce. "Congress had a rational basis to believe that providing for the regulation of take of purely intrastate species like the Utah prairie dog is essential to the ESA's comprehensive regulatory scheme." Id . at 1006-07.

The Raich Court recognized that Congress exercised its authority under the ICC and the Necessary and Proper Clause to pass "comprehensive legislation to regulate" the illicit substances market. Raich , 545 U.S. at 22, 125 S.Ct. 2195. "Congress was acting well within its authority to 'make all Laws which shall be necessary and proper' to 'regulate Commerce ... among the several States.' " Id . (quoting U.S. Const. art. I, § 8, cl. 3 and cl. 18). Because Congress had "a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA," the regulation of noncommercial, intrastate activity-home cultivation and possession of medical marijuana-was "of no moment." Id . The Court refused to "excise individual components of that larger scheme." Id . It was therefore "necessary and proper" under Congress's ICC power to regulate the noncommercial, intrastate activity. Id . Because the Government does not rely on the Necessary and Proper Clause to defend § 2423(c), we do not address that provision.

The dissent emphasizes the economic and noneconomic distinction. See Dissent Op. at 1257 ("The fact that noncommercial nonconsensual sexual activity is not economic activity is extremely important, probably dispositive, in determining whether it is subject to the third category of regulation of commerce."). But this distinction arose from federalism concerns in the ICC context, and those concerns do not apply here.
Even in the ICC context, the Court has never "adopt[ed] a categorical rule against aggregating the effects of any noneconomic activity." Morrison , 529 U.S. at 613, 120 S.Ct. 1740. The Court has upheld congressional regulation of noncommercial activity, see Raich , 545 U.S. at 21-22, 125 S.Ct. 2195, and this court has upheld laws regulating what appeared to be noneconomic activity. See PETPO , 852 F.3d at 1002 (upholding the protection of prairie dogs under the ESA).

The dissent relies on the three-factor framework laid out in Patton , but eschews a holistic analysis. It recognizes that three factors-(1) the activity's relation to commerce, (2) congressional findings, and (3) jurisdictional hook-are relevant to our substantial-effect analysis, see Dissent Op. at 1257-58, but analyzes them separately from each other, see id. at 1258-64. Here, we consider the legislative history, the regulatory scheme, and the jurisdictional hook together in "answer[ing] [the] question" of "whether Congress had a rational basis to find that the regulated activity, taken in the aggregate, would substantially affect interstate commerce." Patton , 451 F.3d at 623 ; see also Raich , 545 U.S. at 10-11, 22-23, 125 S.Ct. 2195.

The Ninth Circuit also has upheld § 2423(c) under the FCC in a challenge to the provision's prohibition of commercial illicit sexual conduct. See Clark , 435 F.3d 1100. It also recently interpreted the language of § 2423(c) without addressing its constitutionality. See United States v. Pepe , 895 F.3d 679 (9th Cir. 2018).

Mr. Durham also alleged in his initial motion for new trial that the Government violated Brady because it suppressed video data of his conversation with Ms. Menja, in which he confessed to certain allegations against him. The district court rejected this claim, and Mr. Durham has not pursued it on appeal.

The motion also alleged that AUSA Gifford had failed to correct Dr. Abdulkadir's false testimony in violation of Napue v. Illinois , 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). ROA, Vol. 3 at 500-04. The district court denied the Napue claim, concluding there was no evidence that Dr. Abdulkadir committed perjury rather than testified inconsistently with Mr. Durham's expert, Nurse Dunson. Id. at 808-09. On appeal, Mr. Durham does not present a Napue argument. He concedes that he "cannot prove that Dr. Abdulkadir herself knew [her testimony] was false" and thus that his Napue claim is foreclosed by United States v. Garcia , 793 F.3d 1194 (10th Cir. 2015). Aplt. Reply Br. at 6 n.1; see Garcia , 793 F.3d at 1207 ("A Napue violation occurs when (1) a government witness committed perjury , (2) the prosecution knew the testimony to be false, and (3) the testimony was material." (emphasis added) ); see also UnitedStates v. Caballero , 277 F.3d 1235, 1244 (10th Cir. 2002) ("Even postulating tension between [a witness]'s responses on direct and cross, such inconsistency alone does not establish the knowing use of perjured testimony." (emphasis added) ).

In this regard, the concerns of DA Prater and ADA Geiger were well taken. See ROA, Vol. 3, at 813-15.

The Government argues it did not suppress because the defendant knew or could have acquired the information from another source. Aplee. Br. at 22. Due to our disposition of the Brady issue on lack of prejudice, we do not address this argument.

Although Mr. Durham sought to exclude the statement about a temptation to touch children before trial, he does not challenge its admission on appeal.

Although the statements at issue "are party admissions under [Federal Rule of Evidence] 801(d) and thus not hearsay, they must nevertheless also be analyzed for admissibility under Rule 404(b)" because they reference other acts that could have been used as propensity evidence. United States v. Oberle , 136 F.3d 1414, 1418 (10th Cir. 1998).

We note the district court offered a limiting instruction on this evidence, which defense counsel rejected. ROA, Vol. 12 at 725-26 (TT 111-12). The instruction likely would have lowered the prejudicial effect of the evidence, and Mr. Durham should not now benefit from declining it.

Mr. Durham does not contend that the district court did not rule on the prosecutorial misconduct ground raised in his motion for a new trial. See Aplt. Br. at 34-39. Regardless of whether the district court ruled on this issue, the record is sufficiently developed to show that any error did not affect Mr. Durham's substantial rights under our plain error standard of review, as we explain below.

Mr. Durham "submits he properly preserved the [issue of prosecutorial misconduct] and that the standard of review is abuse of discretion" because he "raised the issue ... in his motion for new trial." Aplt. Br. at 34. Our precedent forecloses this argument. See Toro-Pelaez , 107 F.3d at 828 (when the defendant "failed to contemporaneously object regarding the ... reasons he asserts as justification for a new trial[,] ... we ... may only reach the issue if we find plain error").

Even if we were to conclude that the objections on the ground of repetitiousness sufficed to put the district court on notice that defense counsel believed the Government was making a propensity argument, Mr. Durham would still not be entitled to relief. Our reasons, discussed below, for determining that any error in the prosecution's questioning did not affect Mr. Durham's substantial rights would also persuade us that any error was harmless beyond a reasonable doubt.

Mr. Durham's argument assumes that the jury harbored biases about sexual orientation. He has not provided any evidence that it did, but to the extent his assumption holds, we nevertheless conclude Mr. Durham has not shown that any error affected his substantial rights, as we explain below.

Gov't Exh. 3, 1 minute, 49 seconds (preliminary conversation); Gov't Exh. 4, 12 minutes 10 seconds (Mr. Durham describing his interactions with various children); Gov't Exh. 5, 29 seconds (Mr. Durham calling his mother to discuss his actions); Gov't Exh. 6, 20 seconds (Mr. Durham writing out his interactions with various children); Gov't Exh. 7, 10 seconds (another video of Mr. Durham writing out his interactions with various children.)

Mr. Durham also renewed his motion for an "expedited chain of custody hearing." ROA, Vol. 2 at 533 (capitalization altered).

Defense counsel described a "logical image" as "a smaller portion of a forensic image." ROA, Vol. 12 at 595.

On cross-examination, Mr. Durham's counsel asked Ms. Menja about the context of the videos and why some were started or stopped when they were, but not about alterations. ROA, Vol. 12, at 893-961.

No chain of custody analysis was necessary given that Ms. Menja's testimony provided a foundation for the video, which was "unique, readily identifiable and relatively resistant to change." Cardenas , 864 F.2d at 1531. Mr. Durham contends that the videos were "easily subject to manipulation" but did not choose to present evidence on this point at trial. Aplt. Reply Br. at 16. He otherwise does not argue in his briefing why the video was not "readily identifiable."

Mr. Durham's hearsay argument in his opening brief consists of two sentences: "The PRC Forms and clinician notes contain information relayed by the patient or third parties. This constitutes inadmissible double hearsay. See United States v. Gwathney , 465 F.3d 1133, 1141 (10th Cir. 2006)." Aplt. Br. at 47-48. In his reply brief, he maintains that a particular victim's identification of Mr. Durham during her examination was "impermissible double hearsay" but contests no other specific information in the victims' medical records. Aplt. Reply Br. at 19. We therefore consider only the abuser identification hearsay argument because Mr. Durham fails to identify any other information in the medical records he wishes to challenge on hearsay grounds.

Mr. Durham cites United States v. Gwathney , 465 F.3d 1133, 1141 (10th Cir. 2006), to support his "double hearsay" argument. Aplt. Br. at 47-48. In Gwathney , we said that "[a]ny information provided by another person, if an outsider to the business preparing the record, must itself fall within a hearsay exception to be admissible." 465 F.3d at 1141. Here, the statement made by the "outsider"-the victim identifying the abuser-is admissible under the hearsay exception recognized in Federal Rule of Evidence 803(4).

Mr. Durham raises a new argument in reply that, to the extent his counsel invited error, his counsel was ineffective. Aplt. Reply Br. at 21. Because that argument was not raised in his opening brief, it is waived. See Silverton Snowmobile Club v. U.S. Forest Serv. , 433 F.3d 772, 783 (10th Cir. 2006) (declining to consider arguments not raised in opening brief). It would be more appropriate to raise this argument through a motion under 28 U.S.C. § 2255. See United States v. Galloway , 56 F.3d 1239, 1242 (10th Cir. 1995) (en banc) ("The rule in this circuit ... is that claims of constitutionally ineffective counsel should be brought on collateral review, in the first petition filed under 28 U.S.C. § 2255.").

The PSR calculated Mr. Durham's total offense level to be 49 and his criminal history category to be I. ROA, Vol. 7 at 135, 136. Under the Guidelines, an offense level exceeding 43, the highest offense level reflected in the sentencing table, "is to be treated as an offense level of 43." U.S.S.G. Ch. 5, Pt. A (Sentencing Table), Application Note 3. The Guidelines recommend a sentence of "life" for a defendant with an offense level of 43, regardless of the criminal history category. See U.S.S.G. Ch. 5, Pt. A (Sentencing Table). The probation officer who prepared Mr. Durham's PSR, after consulting with the United States Sentencing Commission, arrived at a Guidelines sentence of 1,440 months to be consistent with the cumulative statutory maximum sentence for the four counts of conviction. ROA, Vol. 7 at 142 n.3. Under these circumstances, the PSR calculated a recommended Guidelines sentence rather than a sentence range.

Based on its finding that Mr. Durham had committed perjury at trial, the district court applied a two-level enhancement for obstruction of justice, bringing Mr. Durham's offense level to 51. ROA, Vol. 7 at 475. Because the offense level calculated in the PSR already exceeded the maximum offense level of 43, the two-level enhancement had no effect on the recommended Guidelines sentence.

The 480-month sentence consists of 360 months on each of the four counts of conviction, running partially consecutively and partially concurrently to achieve the total sentence of 480 months. ROA, Vol. 3 at 844; ROA, Vol. 13 at 158-59.

Courts must consider the following factors in imposing a sentence:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed-
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) [the applicable Guidelines recommended kind and range of sentence];
(5) [any pertinent Guidelines policy statements];
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a).

Mr. Durham's sentence of 480 months is less than the recommended Guidelines sentence of 1,440 months, as determined by the district court. Whether we characterize Mr. Durham's sentence as within or below the Guidelines range, it is entitled to a presumption of reasonableness. See Kristl , 437 F.3d at 1054 ; Balbin-Mesa , 643 F.3d at 788.

In any event, we are not persuaded that the Commission has "state[d] that a life sentence is the equivalent of 470 months." Aplt. Br. at 58. Mr. Durham cites an online publication entitled the "Variable Codebook for Individual Offenders." Id. This publication defines the standard codes the Commission applies to the sentencing data it gathers, including the code "470," which denotes life sentences. See generally U.S. Sentencing Comm'n, Variable Codebook for Individual Offenders: Standardized Research Data Documentation for FY1999-2014 (Rev. Apr. 8, 2015), available at https://perma.cc/A8X6-8TTF. Contrary to Mr. Durham's assertion, the publication nowhere equates a life sentence with 470 months in prison.

We "include[ ] [Brady claims] in the cumulative-error calculus if they have been individually denied for insufficient prejudice." Cargle v. Mullin , 317 F.3d 1196, 1207 (10th Cir. 2003). Here, as discussed above, we held that no Brady violation occurred because the withheld evidence lacked materiality, which speaks to prejudice. We therefore include the alleged Brady error in our cumulative error analysis.

In our above discussion of the prosecutorial misconduct claim, we "did not determine whether [the] alleged errors constituted actual errors but instead concluded that any potential errors did not merit reversal because they did not affect the outcome of Mr. [Durham's] case." Anaya , 727 F.3d at 1061. "For the purposes of cumulative error analysis, we assume without deciding that these alleged errors were errors and proceed accordingly." Id.